WGN CONTINENTAL BROADCASTING COMPANY and Albuquerque Cable Television, Inc., Plaintiffs-Appellants,

v.

UNITED VIDEO, INC.,
Defendant-Appellee.

No. 81–2687.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1982.

Decided Aug. 11, 1982.

Opinion on Denial of Rehearing and Rehearing En Banc Oct. 22, 1982.

Don H. Reuben, Reuben & Proctor, Chicago, Ill., for plaintiffs-appellants.

Alan Raywid, Cole, Raywid & Braverman, Washington, D. C., for defendant-appellee.

Before POSNER and COFFEY, Circuit Judges, and CAMPBELL *, Senior District Judge.

POSNER, Circuit Judge.

This appeal requires us to decide a question of first impression under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*: to what extent does the copyright on a television program also include program material encoded in the "vertical blanking interval" of the television signal?

Each picture that flashes on a television screen is generated by an electron gun behind the screen that moves rapidly back and forth from the top to the bottom of the screen. When the gun reaches the bottom it shuts off and returns to the top of the screen to begin again. The interval in which the gun is shut off—an interval too brief for the viewer to be aware of—is the vertical blanking interval. It has traditionally been used to carry certain signals that "tell" the television set how to set up the next picture on the screen, but the time required for this function is only a fraction of the interval, and the rest is available, and increasingly is used, to carry other information. Subtitles for deaf people are the most common such use; they appear as an overlay at the bottom of the television picture on sets equipped with a suitable decoder to "unlock" the information carried in the vertical blanking interval and to display it—much as the electron gun generates the regular picture—on the screen. But all sorts of other information can be encoded in the unused portion of the vertical blanking interval—news bulletins, weather reports, ballgame scores, station announcements,

* Of the Northern District of Illinois.

the stock ticker, etc. Overlaying the information on the television picture is only one method of display; alternatively, the information can be displayed on a different channel of the television set, or on a different set altogether.

WGN is an "independent" television station in Chicago (that is, it is not affiliated with any of the television networks) and it is also a "superstation," meaning that its programs are carried, outside its local area, by cable television systems. To get those programs to the cable systems requires the services of an intermediate carrier such as United Video, a satellite common carrier that plucks broadcast signals off the air, including signals from WGN, and transmits them to cable systems.

WGN decided to experiment with "teletext" (as the use of the vertical blanking interval to carry material intended for the television viewer is called) by broadcasting at first just a test signal, then news stories and a program schedule, in the vertical blanking intervals of its copyrighted 9:00 p.m. news broadcast. The teletext was intended for subscribers to a WGN–affiliated cable system in Albuquerque who own television sets equipped with a suitable decoder. The cable system planned to run the teletext on a different channel (which the viewer would select, if we understand correctly, by pushing a button on the decoder) from the one on which it runs the nine o'clock news. But the cable system never received the teletext. United Video did not retransmit it along with the nine o'clock news but instead substituted teletext supplied by Dow Jones, containing business news. WGN and its affiliate brought this suit to enjoin, as a copyright infringement, United Video's refusal to retransmit WGN's teletext along with the nine o'clock news. See 17 U.S.C. §§ 501(a), (b), 502(b). They appeal from the district court's judgment holding that United Video did not violate the Copyright Act and dismissing the complaint. 523 F.Supp. 403 (N.D.Ill.1981).

It used to be that a cable system that picked up and retransmitted a broadcast signal containing a copyrighted program was not an infringer. See *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968); *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974). But the Copyright Act of 1976 changed this, though it allows a cable system to pick up and retransmit broadcast signals without the copyright owner's permission so long as it pays him royalties as fixed in the statute. See 17 U.S.C. § 111. However, "secondary transmissions" made by "any carrier who has no direct or indirect control over the content or selection of the primary transmission or over the particular recipients of the secondary transmission, and whose activities with respect to the secondary transmission consist solely of providing wires, cables, or other communications channels for the use of others ...," are exempt from any copyright liability. 17 U.S.C. § 111(a)(3). A "primary transmission" is the initial broadcast; a "secondary transmission" is the "further transmitting" of a primary transmission. 17 U.S.C. § 111(f). The exemption thus allows carriers such as United Video to act as purely passive intermediaries between broadcasters and the cable systems that carry the broadcast signals into the home, without incurring any copyright liability. The cable system selects the signals it wants to retransmit, pays the copyright owners for the right to retransmit their programs, and pays the intermediate carrier a fee for getting the signal from the broadcast station to the cable system. The intermediate carrier pays the copyright owners nothing, provided it really is passive in relation to what it transmits, like a telephone company. See S.Rep.No. 473, 94th Cong., 1st Sess. 78 (1975). It may not even delete commercials; an important part of the scheme set up in section 111 is the requirement that any cable system that wants to retransmit a broadcast signal without negotiating with the broadcast station or copyright owner transmit intact any

commercials it receives from that station. See 17 U.S.C. § 111(c)(3).

■ What we have explained so far is common ground between the parties; and another point can be disposed of briefly: although United Video's retransmission of WGN's broadcast signal to the cable systems may be immunized from copyright liability by the exemption in section 111(a)(3) for passive carriers, it cannot be immune just because United Video does not retransmit WGN's signal directly to the public—that is, to the cable subscribers—but instead transmits the signal to cable systems which retransmit it to their subscribers. The passive carrier exemption would be superfluous if intermediate carriers such as United Video could never be infringers anyway because they do not transmit directly to the public. And the scheme in section 111 for compensating copyright owners would be disrupted, or at least made cumbersome. United Video could mutilate to its heart's content the broadcast signal it picked up and the copyright owner would have no recourse against it. His only recourse would be against the cable systems—more than a thousand in the case of WGN—that were retransmitting the mutilated signals: a thousand or more copyright infringement suits instead of one.

We cannot find good textual support for the district court's position. The word "public" does not appear either in the definition of secondary transmission or in the provision making the carrier of a secondary transmission liable unless passive. See 17 U.S.C. §§ 111(a), (f). It is true that WGN can complain only if United Video is interfering with its exclusive right to perform or display the copyrighted work publicly. 17 U.S.C. §§ 106(4), 106(5). But the Copyright Act defines "perform or display ... publicly" broadly enough to encompass indirect transmission to the ultimate public, who in this case are the subscribers to WGN's cable affiliate in Albuquerque. "To perform or display a work 'publicly' means ... to transmit or otherwise communicate a performance or display of the work ... to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101.

■ Therefore, no exemption for nonpublic performance is available in this case. And United Video cannot avail itself of the passive carrier exemption, because it was not passive—it did not retransmit WGN's signal intact. But the fact that United Video cannot claim an exemption from copyright liability does not conclude the case. It needs an exemption only if it would otherwise be an infringer, and it would be that only if WGN's copyright of the nine o'clock news includes the teletext in the vertical blanking intervals. If it does, the deletion of the teletext from United Video's retransmission was an alteration of a copyrighted work and hence an infringement under familiar principles. A copyright licensee who "makes an unauthorized use of the underlying work by publishing it in a truncated version" is an infringer—any "unauthorized editing of the underlying work, if proven, would constitute an infringement of the copyright in that work similar to any other use of a work that exceeded the license granted by the proprietor of the copyright." *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 20 (2d Cir. 1976).

Before deciding whether WGN's copyright does cover the teletext at issue, we consider briefly what if anything turns on our answer to this question. WGN could copyright its teletext separately; but it has not done so and does not want to do so, because if the teletext were copyrighted separately United Video would have no obligation to retransmit it. United Video is not required to retransmit WGN's entire broadcast day; it is required only to transmit those programs that cable systems ask United Video to carry to them; and they

might or might not want WGN's teletext. But if the teletext is covered by the copyright on the nine o'clock news, then any cable system that wants the nine o'clock news must take the teletext with it.

Now WGN cannot in the long run force cable systems to take more of its output than they want; competition with other "superstations" will prevent that. But WGN must perceive some advantage to putting United Video to an all or nothing choice—a choice between the nine o'clock WGN news plus teletext, or no nine o'clock WGN news at all. Although there is a distinct echo in this of "tie-in" sales and "block booking," practices that in other contexts have been thought to raise serious antitrust problems, the echo is too faint to guide our interpretation of the Copyright Act.

■ The WGN nine o'clock news is an "audiovisual work," defined in the statute as a work that consists "of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the [work is] embodied." 17 U.S.C. § 101. United Video appears to concede, correctly in our view despite an absence of judicial authority on the point, that if WGN's teletext were intended to be overlaid on the television images of the nine o'clock news, in the manner of captions for deaf people or English subtitles for foreign movies, it would be covered by the copyright for that news. Cf. 1 Nimmer, Nimmer on Copyright § 2.09[A] (1981). It would be part of the performance intended to be seen by the viewer and thus one of the "related images" of which section 101 speaks. And though WGN chooses not to use the vertical blanking interval to overlay additional images on those in the nine o'clock news, it is clear that United Video may not use it for that purpose without

WGN's permission, any more than if the publisher of a book leaves the inside covers blank the book seller (or book wholesaler, to make the analogy more precise) may inscribe the Lord's Prayer on them in order to broaden the book's appeal. See *National Bank of Commerce v. Shaklee Corp.*, 503 F.Supp. 533, 543–44 (W.D.Tex.1980).

■ But while WGN says that it plans eventually to use the vertical blanking interval for overlays, that is not the intended placement of the teletext involved in this case. This teletext fills up the whole television screen; overlaid on the nine o'clock news it would either obliterate the picture portion of the news or produce an unintelligible collage. It is intended to be viewed either on another television set or, more likely, on another channel of the same set. The typical cable system has an abundance of channels and can devote one of them to WGN's teletext. The question is whether it must do so if it wants to use WGN's copyrighted nine o'clock news. We think so, provided the teletext is intended to be seen by the same viewers as are watching the nine o'clock news, during the same interval of time in which that news is broadcast, and as an integral part of the news program.

There is no paradox in suggesting that teletext is covered by the copyright on a regular television program provided that it is intended to be viewed with and as an integral component of that program, even though we have just said that WGN's teletext is to be shown on a different channel from the nine o'clock news, which means that it cannot be viewed simultaneously, as subtitles are. Each frame in a motion picture is covered by the copyright on the motion picture even though the frames are not intended to be viewed simultaneously; and while they are intended to be seen in a rigid sequence, 17 U.S.C. § 101 speaks not of a sequence of related images but only of related images. The pages of books are also usually read sequentially, but this has never been thought a condition of copyright

protection. A dictionary can be copyrighted although its pages, and the entries on each page, are not intended to be read in sequence. And if the publisher of a history book includes a fold-out map as an endpaper for the reader to consult from time to time while reading the text, the copyright on the book includes the map although the map is not intended to be read either simultaneously with the text or in some prescribed sequence with it. See 1 Nimmer, *supra*, at § 2.08[A][2].

WGN's proposed use of teletext is analogous. The teletext channel is to contain an announcement of future programming on WGN. The viewer of the nine o'clock news, a compendium not all parts of which may interest every viewer, is thus invited to switch to the teletext channel when his attention to the news flags, to see what is forthcoming on WGN. The teletext channel is also to carry local news of Chicago that parallels the national news carried on the main program. If the main program was discussing inflation nationwide, the teletext channel might provide data on inflation in Chicago; and the viewer in Albuquerque who was interested in conditions in Chicago (maybe his children live there, or he is planning to move there) might decide to switch to the teletext channel. In short, WGN wants to make its nine o'clock news a two-channel program, and we cannot see that the difference between a one- and a two-channel program is much more profound than that between a silent movie and a talkie. If television technology were so primitive that it required two channels, broadcasting simultaneously, to carry a sound program—one to carry the picture, the other the sound—and if the vertical blanking interval were used to transmit the sound, we do not think it would be argued that the copyright of the program did not include the sound track because it was on a separate channel. Cf. 1 Nimmer, *supra*, at § 2.09[E][1]. Neither do we think it would be argued that a televised musical performance and its "stereo simulcast" require separate copyrights.

We do not pretend to find in these analogies, any more than in the definition of "audiovisual work" in section 101, conclusive evidence of legislative purpose. The fact is that Congress did not foresee the kind of use that WGN has made of the vertical blanking interval. Nor do we find in the language, structure, or legislative history of the Copyright Act of 1976 some overarching purpose that would enable us to deduce how Congress would have decided the copyright question in this case if it had considered it. There is of course a sense in which the Act is "pro" copyright holder—it gave copyright owners protection against cable systems, which the Supreme Court had held the prior act did not. But by also requiring compulsory licensing it stopped far short of giving them complete protection; and there is no evidence that it wanted the WGNs of this world to get the additional protection sought in this case. Extrinsic policies, such as the antitrust policies mentioned earlier, are too remotely involved to provide guidance.

All other aids to statutory construction failing, we fall back on the broad definition of "audiovisual work" in the statute and on the analogy between WGN's use of the vertical blanking interval and examples drawn from both audiovisual and literary media. The broad definition may not be inadvertent. The comprehensive overhaul of copyright law by the Copyright Act of 1976 was impelled by recent technological advances, such as xerography and cable television, which the courts interpreting the prior act, the Copyright Act of 1909, had not dealt with to Congress's satisfaction. This background suggests that Congress probably wanted the courts to interpret the definitional provisions of the new act flexibly, so that it would cover new technologies as they appeared, rather than to interpret those provisions narrowly and so force Congress periodically to update the act. The House Report states: "Authors are continually finding new ways of expressing themselves, but it is impossible to foresee the forms that these new expressive methods

will take. The bill does not intend either to freeze the scope of copyrightable technology or to allow *unlimited* expansion to areas *completely* outside the present congressional intent. Section 102 [a lengthy enumeration of copyrightable works of authorship, including audiovisual works] implies neither that the subject matter is unlimited nor that new forms of expression within that general area of subject matter would necessarily be unprotected." H.R.Rep.No.1476, 94th Cong., 2d Sess. 51 (1976) (emphasis added). We take this passage, despite its hedging language, as some warrant for the method of interpretation employed in this opinion, which allows new types of "audiovisual work" to be recognized by analogy to the old.

■ We want to make clear, however, that our holding is not that WGN "owns" the vertical blanking interval in the programs that it has copyrighted. The copyright is in the programming rather than in the method by which it is transmitted. See 17 U.S.C. § 102(a); cf. 1 Nimmer, *supra*, at §§ 2.03[C], 2.18[F]. If WGN devised a teletext that was not intended to be viewed in conjunction with the nine o'clock news—a cartoon show for preschoolers, for example—the fact that it used the vertical blanking intervals in the signal transmitting that news to encode the teletext would not give the teletext copyright protection as part of the nine o'clock news. The images in the teletext could not in that case be regarded as "related images" to those in the news. WGN may not, by exploiting the marvels of modern technology, create two or three or 30 channels of unrelated programming and force it all down the throats of any cable system that wants just the nine o'clock news (not that it would find many takers of that news in those circumstances). But if WGN wants to create multi-channel news or entertainment for viewers willing to switch back and forth between channels, we cannot find anything in the Copyright Act to prevent it from copyrighting its video smorgasbord.

A simpler line, of course, would be that between overlay material and nonoverlay (shown on a different channel) material. But it would also be an arbitrary line unless we thought Congress meant "related images" to be limited to images shown on a single channel, and we have already rejected such a limiting interpretation. As there is no question that WGN's teletext was intended to be viewed in conjunction with the nine o'clock news, WGN has proved copyright infringement and is entitled to an injunction.

REVERSED AND REMANDED.

## ON PETITION FOR REHEARING WITH SUGGESTION FOR REHEARING EN BANC

The members of the original panel have voted to deny the petition for rehearing, and no active judge in regular service has voted to grant rehearing *en banc,* so the petition is denied. But we take this opportunity to deal with a misconception that underlies the arguments made in the petition.

In our original opinion, we used some imprecise language on which United Video has constructed its principal argument for a rehearing. We said that WGN's teletext was intended to be shown on a different "channel" from its nine o'clock news. What we should have said to be precise was that the teletext was intended not to be superimposed on the news but to be viewed separately *as if* on a different channel. To switch to the teletext the viewer pushes a button, which on many television sets is also the method of switching channels. But the teletext is not on a different channel; it is on the same channel· as the program in whose vertical blanking intervals it is being transmitted; it merely

is invisible to the viewer until he pushes the decoder button.

The difference becomes significant in light of United·Video's argument that since many cable television systems transmit only 12 channels of programming (though most are capable of transmitting between 50 and 100 channels), and are obliged by law to carry the signals of the local television stations in the system's community, a requirement that they carry teletext intended to be viewed in conjunction with those signals could swamp the capacity of many systems—a consequence too drastic to impute to Congress without clearer evidence of legislative intent than we found. But this assumes, incorrectly, that each station's teletext occupies a different channel. It does not; it is part of the channel on which the station's regular programming is carried. No displacement of any other programming is threatened by our decision.

█ The petition for rehearing also takes us to task for having given insufficient weight to the word "*series* of related works" in the statutory definition of audiovisual work. 17 U.S.C. § 101 (emphasis added). But the main program and any teletext intended to be viewed with, and as an integral part of, the main program (our condition for recognizing copyright protection of the teletext as part of the copyright on the main program) are in a series or sequence, and though it is one determined by the viewer himself we do not think the statutory term "series" must be interpreted to mean a rigid, predetermined sequence.

Finally, in view of the suggestion in the petition that we have adopted a loose and spongy "relatedness" test to determine when teletext is covered by the copyright on the main program, we repeat what we said in our opinion: WGN's teletext is covered by the copyright on its nine o'clock news "provided the teletext is intended to be seen by the same viewers as are watching the nine o'clock news, during the same interval of time in which that news is broadcast, and as an integral part of the news program." More than "relatedness" is required, and is present here.