809 F.2d 172
 1987 Copr.L.Dec. P 26,043, 1 U.S.P.Q.2d 1379
 The NATIONAL ASSOCIATION OF BROADCASTERS, Canadian
Claimants, Program Suppliers, Petitioners,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent,
American Society of Composers, Authors and Publishers;
Broadcast Music, Inc.; SESAC, Inc.; Program Suppliers;
Multimedia Entertainment, Inc.; Canadian Claimants;
Old-Time Gospel Hour; PTL Television Network; Public
Broadcasting Service; Joint Sports Claimants; Turner
Broadcasting System, Inc.; the Christian Broadcasting
Network, Inc.; the National Association of Broadcasters, Intervenors.
 Nos. 1491-1493, Docket 86-4042, 4056, 4066.
 United States Court of Appeals,
Second Circuit.
 Argued July 16, 1986.
Decided Dec. 22, 1986.
 
 John I. Stewart, Jr., Washington, D.C. (Victor E. Ferrall, Jr., David H. Solomon, Crowell & Moring, Henry L. Baumann, Julian L. Shepard, Nat. Ass'n of Broadcasters, Washington, D.C., of counsel), for petitioner/intervenor Nat. Ass'n of Broadcasters.
 W. Thad Adams, III, Charlotte, North Carolina (John H. Midlen, Jr., Washington, D.C., of counsel), for petitioners/intervenors Old-Time Gospel Hour and PTL Television Network.
 Douglas G. Thompson, Jr., Washington, D.C. (L. Kendall Satterfield, Finkelstein, Thompson, Levenson & Lewis, Washington, D.C., Erica Redler, Canadian Broadcasting Corp., of counsel), for petitioners/intervenors Canadian Claimants.
 Irene M. Solet, Civil Div., Dept. of Justice, Washington, D.C. (Richard K. Willard, Asst. Atty. Gen., John F. Cordes, Civil Div., Dept. of Justice, Robert Cassler, Copyright Royalty Tribunal, Washington, D.C., of counsel), for respondent Copyright Royalty Tribunal.
 Gene A. Bechtel, Washington, D.C., (Bechtel & Cole, Washington, D.C., Jacqueline Weiss, Deputy Gen. Counsel, Public Broadcasting Service, Alexandria, Va., of counsel), for intervenor Public Broadcasting Service.
 Arnold P. Lutzker, Washington, D.C. (James M. McElfish, Jr., Dow, Lohnes & Albertson, Washington, D.C., of counsel), for intervenor Multimedia Entertainment, Inc.
 Dennis Lane, Washington, D.C. (Arthur Scheiner, Leslie A. Swackhamer, Rebecca L. Dorch, Wilner & Scheiner, Washington, D.C., of counsel), for petitioner/intervenor Motion Picture Ass'n of America, Inc., et al. (Program Suppliers).
 Bernard Korman, I. Fred Konigsberg, Edward W. Chapin, Nicholas Arcomano, New York, N.Y., Charles T. Duncan, Reid & Priest, Washington, D.C., Michael W. Faber, Lisa Holland Powell, of counsel, for intervenors American Society of Composers, Authors and Publishers, Broadcast Music, Inc. and SESAC, Inc.
 David H. Lloyd, Robert Alan Garrett, Terri A. Southwick, Arnold & Porter, Philip R. Hochberg, Baraff, Koerner, Olender & Hochberg; Robert W. Coll, McKenna, Wilkinson & Kittner; Ritchie T. Thomas, Judith Jurin Semo, Squire, Sanders & Dempsey, Washington, D.C., Edwin M. Durso, Office of the Com'r of Baseball, New York, N.Y., of counsel, for intervenors Joint Sports Claimants.
 Nathan Lewin, Jamie S. Gorelick, Miller, Cassidy, Larroca & Lewin, Lois J. Schiffer, Carol R. Whitehorn, Nat. Public Radio, Washington, D.C., of counsel, for intervenor Nat. Public Radio.
 Before WINTER and MAHONEY, Circuit Judges, and CABRANES,* District Judge.
 WINTER, Circuit Judge:
 
 
 1
 These consolidated petitions involve various challenges to the 1983 distribution of cable television royalty fees by the Copyright Royalty Tribunal ("CRT" or "Tribunal"), an agency established pursuant to Sections 801-810 of the 1976 Copyrights Act ("Act" or "1976 Act"), 17 U.S.C. Secs. 801-810 (1982). After four of the five previous annual distributions, dissatisfied cable royalty claimants appealed the Tribunal's determinations to the District of Columbia Circuit. See National Association of Broadcasters v. Copyright Royalty Tribunal (NAB v. CRT I), 675 F.2d 367 (D.C.Cir.1982) (reviewing Tribunal's first cable royalty distribution, of royalties paid for calendar year 1978); Christian Broadcasting Network, Inc. v. Copyright Royalty Tribunal (CBN v. CRT), 720 F.2d 1295 (D.C.Cir.1983) (reviewing cable royalty distribution for calendar year 1979); National Association of Broadcasters v. Cable Royalty Tribunal (NAB v. CRT II), 772 F.2d 922 (D.C.Cir.1985) (reviewing cable royalty distributions for calendar years 1980 and 1982), cert. denied, --- U.S. ----, 106 S.Ct. 1245, 89 L.Ed.2d 353 (1986).
 
 
 2
 Each distribution was affirmed in substantial part by a court increasingly critical of "the claimants' studied tack to date of 'boundless litigiousness,' " NAB v. CRT II, 772 F.2d at 940 (quoting CBN v. CRT, 720 F.2d at 1319), and increasingly unwilling to engage in a detailed analysis of "the various nooks and crannies of the Tribunal's decisions." 772 F.2d at 940. Thus encouraged either to forgo the usual automatic challenge to the Tribunal's determinations, no doubt an unthinkable alternative in the "highly litigious copyright-owner subculture," id., or to seek a different Court of Appeals, claimants to the 1983 Cable Royalty Fund petitioned us for review of the cable royalty distribution. With the exception of two issues, however, only the circuit is new, and the petitions raise the usual array of noisily contested minutiae concerning the precise allocations of cable royalty fees. An elaborate response to these latter claims is not justified, and our discussion of the merits will be devoted largely to the two new issues.
 
 
 3
 We deny the petitions.
 
 I. GENERAL BACKGROUND
 
 4
 Because this case is but the latest in a series of appeals from cable royalty distribution proceedings, see supra, familiarity with which is assumed, we need discuss only briefly the Act's compulsory licensing scheme. Under 17 U.S.C. Sec. 111, cable television operators may obtain a license permitting retransmission of certain copyrighted programming, known as distant broadcast signals.[1] A cable system is protected from copyright liability when it carries only those signals and programs designated under the rules of the Federal Communications Commission ("FCC"), and deposits semi-annual royalty payments into a central fund ("Fund"). Id. Sec. 111(c)(2)(A), (B). The 1976 Act set initial royalty fee schedules and authorized the Tribunal to make adjustments in light of inflation, changes in cable subscription rates, and alterations by the FCC of certain of its rules. See id. Sec. 801(b)(2). The Fund is then distributed annually by the Tribunal to the copyright owners whose works have been the subject of distant signal retransmissions. The 1976 Act did not provide precise standards for distributing the Fund to various claimants,[2] but left that task largely to the Tribunal's discretion. However, the Tribunal's determination rarely represents the last step in an annual cable royalty distribution; as noted above, all but one of the Tribunal's final orders have been appealed to the courts, generally without success.
 
 
 5
 In upholding in large part the Tribunal's cable royalty determinations, each of the previous appellate decisions has emphasized the very limited power of reviewing courts. See NAB v. CRT II, 772 F.2d at 926; CBN v. CRT, 720 F.2d at 1304; NAB v. CRT I, 675 F.2d at 374. The narrow scope of review results from the nature of the Tribunal's task in determining what share of the Fund should go to which claimants. Prior courts understandably have viewed the Tribunal's royalty distributions as "scarcely a typical agency adjudication," and as decisions that, by their very nature, are "doomed to be somewhat artificial." NAB v. CRT II, 772 F.2d at 926. In the most recent cable royalty distribution case, the District of Columbia Circuit stated:
 
 
 6
 In reviewing the Tribunal's determinations, the judicial task is not to weigh the evidence and fix what in our view would constitute appropriate percentages, for that would be to intrude into the function entrusted to the Tribunal. Our job, rather, is to determine whether the royalty awards are within a "zone of reasonableness"--not unreasonably high or unreasonably low--and that the [Tribunal's] decision is neither arbitrary nor capricious, and is supported by substantial evidence.
 
 
 7
 Id. (citing NAB v. CRT I, 675 F.2d at 371, 374-75). We share that view of the role of a reviewing court.
 
 
 8
 The 1983 distribution proceeding was preceded by two pertinent developments in cable regulation and licensing. First, in a 1980 order that we upheld in Malrite T.V. of New York v. FCC, 652 F.2d 1140 (2d Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982), the FCC repealed two sets of regulations restricting cable carriage. One set of rules, called the "distant signal rules," had restricted the number of distant signals a cable system was permitted to carry, depending on the size and signal density of the market within which the cable system operated. The other set, styled the "syndicated program exclusivity rules," had required cable systems to black out certain syndicated programming from their distant signals. The blackout right was enforceable either by the program syndicators or by local broadcast stations that had acquired exclusive broadcast rights from the syndicators.[3]
 
 
 9
 Second, the Tribunal adjusted the copyright royalty rates in light of the FCC's elimination of the distant signal and syndicated exclusivity rules. This adjustment was specifically authorized, although not mandated, by the 1976 Act. 17 U.S.C. Sec. 801(b)(2)(B), (C). The Tribunal's adjustments added two new royalty fees to be paid by cable systems. The first, the "3.75% rate," requires cable systems to pay 3.75% of their gross receipts from basic services for each distant signal equivalent they add as a result of the repeal of the FCC's distant signal rules. The second is a syndicated exclusivity ("syndex") surcharge to be paid by cable systems retransmitting signals formerly subject to the FCC's blackout provisions. See Adjustment of Royalty Rate for Cable Systems; Federal Communication's Commission's Deregulation of the Cable Industry, 47 Fed.Reg. 52,146 (1982) (to be codified at 37 C.F.R. pt. 308) (final rule). The Tribunal's order adjusting the compulsory licensing rates was upheld in National Cable Television Association, Inc. v. Copyright Royalty Tribunal (NCTA v. CRT), 724 F.2d 176 (D.C.Cir.1983). As a consequence, issues regarding the precise allocation of fees generated by the 3.75% and syndex royalty rates arose for the first time in the 1983 proceeding now before us for review.
 
 II. THE 1983 PROCEEDING
 A. The Tribunal's Determinations
 
 10
 As in past years, the Tribunal conducted the 1983 proceeding in two phases: Phase I allocated cable royalties among categories of claimants; Phase II divided these royalties among individual claimants within each category. For purposes of the Phase I distribution, the Tribunal divided the cable royalties into three separate funds: the "basic fund," the "3.75% fund," and the "syndex fund." The basic fund corresponded to the royalties available in previous years; the 3.75% and syndex funds resulted from the adjustments of royalty rates described above. After fifty-three days of evidentiary hearings, the Tribunal made the following Phase I distributions:
 
 
 11
 Basic 3.75% Syndex
 ------ ------ ------
Program Suppliers 67.10% 72.00% 95.50%
Joint Sports Claimants 16.35% 17.50% 0
Public Broadcasting
Service 5.20% 0 0
Commercial Television
Broadcasters 5.00% 5.00% 0
Music Claimants 4.50% 4.50% 4.50%
Devotional Claimants 1.10% 0.75% 0
Canadian Claimants 0.75% 0.25% 0
Commercial Radio 0 0 0
 
 
 12
 1983 Cable Royalty Distribution Proceeding, 51 Fed.Reg. 12,792, 12,818 (1986) (final determination).
 
 
 13
 The only controversy in Phase II of the 1983 proceeding arose among members of the Program Suppliers group. In this phase, the Tribunal determined that it would allocate fees from one fund rather than from three separate funds. The Tribunal also concluded that none of the claimants had made a presentation justifying a change in the Phase II awards made in the 1982 proceeding. Accordingly, the Tribunal made the following Phase II allocation:
 
 
 14
 Motion Picture Association of
America ("MPAA") 98.2%
Multimedia Entertainment, Inc.
("Multimedia") 1.0%
National Association of Broadcasters
("NAB")[4] 0.8%
 51 Fed.Reg. at 12,818.
 
 B. The Petitions for Review
 
 15
 The petitioners are various claimant groups who participated in the 1983 proceeding. NAB, a trade association of United States television and radio stations, challenges the Tribunal's decision awarding the bulk of the syndex royalties to Program Suppliers. NAB argues that because television stations (i.e., the broadcasters), not program suppliers (i.e., the syndicators), owned the relevant copyright rights represented by the syndex fund at the times pertinent to the 1983 distribution, the stations should have received the 95.5% syndex allocation.[5]
 
 
 16
 The Canadian Claimants, representing Canadian television broadcasters and producers, attack the Tribunal's distribution of all three funds. Hoping to increase their awards from both the basic and 3.75% funds, they argue that the Tribunal's allocation from these two funds was arbitrary and capricious.
 
 
 17
 Old-Time Gospel Hour and PTL Television Network ("Devotional Claimants"), owners of syndicated programming with religious themes, also seek reversal of the Tribunal's distribution of all three funds.[6] Like Canadian Claimants, they hope to increase their respective shares from the basic and 3.75% funds by establishing that the Tribunal's determinations were arbitrary and capricious. Devotional Claimants also argue that they should have shared in the distribution of syndex funds. Finally, Devotional Claimants maintain that the Copyrights Act mandates distribution from a single royalty fund, rather than from three separate ones.
 
 
 18
 MPAA represents eighty-three producers and/or syndicators in the Program Supplier category. MPAA challenges the Tribunal's allocation of the basic and 3.75% funds as arbitrary and capricious, but, unlike the other petitioners, argues that the awards to Devotional Claimants and Canadian Claimants were too high, rather than too low. MPAA also asserts that the Tribunal's Phase II determinations were not supported by the evidence. Finally, MPAA has filed an intervenor's brief, defending the Tribunal's award of 95.5% of the syndex royalties to Program Suppliers from attack by NAB.
 
 
 19
 Several other parties have also intervened. The Joint Sports Claimants, a group that consists of the National Collegiate Athletic Association and various professional baseball, basketball, hockey, and soccer leagues, intervened to oppose any increase in Canadian or Devotional Claimants' basic and 3.75% awards. The American Society of Composers, Authors and Publishers ("ASCAP"); Broadcast Music, Inc. ("BMI"); and SESAC, Inc., three performing rights societies known collectively as Music Claimants, intervened to defend all aspects of the Tribunal's Phase I determination. Multimedia, a non-MPAA producer and syndicator of television series and specials, intervened to defend the Tribunal's Phase II distribution. Public Broadcasting Service ("PBS"), representing all copyright claimants for programming broadcast on public television stations, intervened to defend its basic fund award. Finally, petitioner NAB intervened to defend its Phase II award from attack by MPAA.
 
 III. DISCUSSION
 
 20
 The issues raised vary widely in complexity and merit. Certain novel issues have arisen because the 1983 proceeding was the first to allocate royalties generated by the new 3.75% and syndex rates. We discuss these issues infra. Petitioners also raise the usual host of detailed, nitpicking challenges to the exact amounts of the Tribunal's distributions. With regard to these latter claims, only the arguments of the Canadian Claimants warrant discussion.
 
 
 21
 A. Allocation of Royalties From Three Separate Funds
 
 
 22
 As described above, the Tribunal divided the royalties into three separate funds in making its Phase I allocation. Devotional Claimants argue that the absence of express authorization for separate funds in the Copyrights Act renders this decision erroneous as a matter of law. We disagree. Congress declined to legislate specific standards to govern the distribution of royalties in order to leave the Tribunal with maximum flexibility. Congress reasoned that "it would not be appropriate to specify particular, limiting standards for distribution" of cable royalties, and deliberately left the distribution criteria to be developed by the Tribunal on the basis of "all pertinent data and considerations presented by the claimants." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 97, reprinted in 1976 U.S.Code Cong. & Admin.News 5659, 5712; see also CBN v. CRT, 720 F.2d at 1303 ("In evaluating the parties' competing claims to the Fund, the Tribunal operates with very little substantive guidance from Congress."). The absence of express legislative authorization of separate funds is thus of no consequence.
 
 
 23
 Moreover, the establishment of the 3.75% and syndex royalty rates made new distribution criteria imperative. Certain claimants are, in fact, ineligible to receive royalties at the new rates,[7] and distribution of royalties from a single fund would require complex adjustments of awards. The Tribunal thus reasonably concluded that its task of distributing royalties would be facilitated by making separate allocations of the royalties collected at the three separate rates.
 
 
 24
 Devotional Claimants also argue that the Tribunal's Phase II determination, which allocated royalties among the various Program Supplier Claimants on a single-fund basis, "demonstrates the fallacy of the [Tribunal's] '3-Fund' approach" in Phase I. Again we disagree. The use of a single-fund approach in Phase II demonstrates that the Tribunal tailored its distribution standards in each phase to the facts presented. As noted above, the claimant categories in Phase I had varying degrees of royalty eligibility. In Phase II, on the other hand, all three claimants were from the Program Supplier category, and all three were eligible to receive some of the royalties at the new rates. The Tribunal determined, moreover, that it did not have sufficient evidence to conclude that the relative carriage of these claimants' programming at the new rates was significantly different than at the basic rate.[8] 51 Fed.Reg. at 12,818. It was thus reasonable to conclude that a single-fund approach in Phase II was appropriate.
 
 B. Distribution of the Syndex Fund
 
 25
 The Tribunal's distribution of the syndex fund--royalties resulting from cable retransmission of broadcast signals formerly subject to the FCC syndicated exclusivity rules--presents a more difficult issue, largely because of the Tribunal's failure to adhere to a consistent rationale for establishing the syndex fund. Under Section 111(d)(4) of the Act, 17 U.S.C. Sec. 111(d)(4), the royalties resulting from cable retransmission of distant signals, including syndex royalties, must be distributed to the "copyright owners" of the retransmitted works.
 
 
 26
 NAB bases its claim on the fact that before the syndicated exclusivity rules were eliminated, broadcasters had entered into long-term contracts with syndicators; these contracts allowed the broadcasters to transmit particular programs and to enforce in their local geographic areas the exclusivity rules as to those programs. The broadcasters thus claim to be the copyright owners under Section 111(d)(4) because such contracts were in effect at times pertinent to the 1983 distribution. In their view, the contracts with the syndicators constituted a purchase of the exclusivity rights that compensated the syndicators for the value of those rights for the full term of the contract. Because the existing contract prices were not altered when the syndicated exclusivity rules were eliminated, NAB argues, the syndicators continued to be compensated for the value of the now nonexistent rights while the broadcasters bore the full costs of losing those rights.
 
 
 27
 We begin our analysis by noting that there is nothing in the Copyrights Act that precludes the broadcasters from being "copyright owners" in their status as holders of syndicated exclusivity rights. Under the Copyrights Act, the right to perform a motion picture or other audiovisual work may, like any exclusive right,[9] be transferred in whole or in part and owned separately. 17 U.S.C. Sec. 201(d)(2). Moreover, any such transfer is a "transfer of copyright ownership" with respect to that right. Id. Sec. 101. We believe, therefore, that the broadcasters' purchase of exclusive broadcast rights from the syndicators under the syndicated exclusivity rules might constitute a "transfer of copyright ownership" under Sections 101 and 201(d)(2).
 
 
 28
 NAB reasons that, because all syndex royalties paid in 1983 were attributable to cable retransmissions of programs formerly subject to the exclusivity rules, the broadcasters are thus the "copyright owners" of all programs covered by the syndex fund.[10] This conclusion is hardly inexorable, however, because broadcasters have a peculiar status with regard to the copyright interests at issue. The logical difficulty with NAB's claim is that broadcasters are both "owners" and "infringers" so far as the exclusivity rules are concerned. The station that is subject to competition from cable transmission of syndicated programs into its local area also may have its own signal and syndicated programs transmitted by cable into distant areas. Viewed in their dual role, the broadcasters would seem to be an anomalous beneficiary of the syndex fund. Rather, that fund would appear to be a method of compensating the relevant copyright owner, namely the syndicator, for the fact that its programs are now being viewed by a much larger audience to the benefit of cable operators.
 
 
 29
 Indeed, in rejecting NAB's claim, the Tribunal explicitly stated that the syndex fund was created because of the increased number of performances of copyrighted programs as a result of cable transmission. 51 Fed.Reg. at 12,81 4. In fact, until NAB asserted its claim, all relevant parties appear simply to have assumed that the syndicators would be the prime beneficiaries of the syndex fund. The history of the FCC's rulemaking includes a statement by the Association of Independent Television Stations, Inc., acknowledging that new royalties resulting from the elimination of syndicated exclusivity rules would be distributed under Section 111(d) to "the copyright owner of the programming aired, not the station." Comments before the FCC, Joint Appendix ("J.A.") 803. After the FCC eliminated the exclusivity rules, NAB played no role in the Tribunal's proceedings that established the syndex rate, but limited its participation to the 3.75% rate proceedings.
 
 
 30
 Were the matter to be decided on the record in this proceeding alone, we would deny the petition on the ground that elimination of syndicated exclusivity rights increased the demand for and exposure of syndicated programs, thus justifying increased royalties paid by the cable operators to the syndicators in the form of the syndex fund. However, we do not write on a clean slate. The syndex fund was established by the Tribunal and upheld by the Court of Appeals for the District of Columbia Circuit on an entirely different ground, namely that elimination of the syndicated exclusivity rules would injure broadcasters economically and thereby cause them to bid less for syndicated programming. NCTA v. CRT, 724 F.2d 176 (D.C.Cir.1983). That court stated:
 
 
 31
 [The Tribunal] credited evidence that distant signal importation by cable diverted audiences from local broadcast stations that had purchased exclusive community rights to syndicated programming; diminished audiences meant lower advertising revenues which translated into reduced bids for programming.... The Tribunal rejected [the cable operators'] assertion, made in opposition to a fee increase, that distant signal audiences generate additional advertising revenue for broadcast stations whose signals are retransmitted by cable....
 
 
 32
 Based primarily on its conclusion that copyright owners were economically harmed by the programming duplication occasioned by cable importation of distant signals, the Tribunal ordered an upward adjustment in the royalty schedule for "old" distant signals to reflect repeal of syndicated exclusivity protection....
 
 
 33
 ....
 
 
 34
 Our review of the record satisfies us that substantial evidence supports the Tribunal's findings that cable importation of distant broadcast signals harms local purchasers of syndicated programming, and that television broadcasters are not compensated by advertisers for the additional distant audiences generated by cable retransmissions.
 
 
 35
 724 F.2d at 188-89.
 
 
 36
 The syndex fund was not established on the theory that cable operators should pay additional royalties for the increased audiences that received syndicated programs after the abolition of the exclusivity rules. Rather, it was based on the theory that local broadcasters would not attract additional advertising in their role as "infringers" sending their signals to distant audiences but would suffer advertising losses from duplication in programming resulting from distant signals transmitted to their local areas by cable.[11] This competitive injury to local broadcasters, it was stated, would reduce their bidding for syndicated programming and thereby reduce the revenues received by syndicators.[12] The syndex fund was thus intended to compensate for the losses caused by the elimination of exclusivity protection, not for the increased exploitation of copyrighted works by cable operators.
 
 
 37
 The Tribunal's original rationale for the syndex fund gives life to NAB's claim. Because the fund is to compensate for the losses that will not be passed on to the syndicators until existing contracts with the broadcasters expire and new bidding begins, those losses are presumably borne for an initial period of time by the local broadcasters.
 
 
 38
 However, the Tribunal had a second and firmer ground for rejecting NAB's claim. It stated:
 
 
 39
 We ... note that the broadcast industry was on notice from 1976 that the syndicated exclusivity rules were subject to change. The stations were also on notice by the consistent representation of the industries in the legislative history and the rulings of the Tribunal that royalties for permitted performances would be awarded to the creators of the works. We can only assume that this awareness was reflected in contract negotiations and accommodations, to the extent necessary, were made accordingly.
 
 
 40
 51 Fed.Reg. at 12,814.
 
 
 41
 Although this argument hardly accounts for the Tribunal's inconstancy of position on the syndex fund, it is sufficient to justify the denial of NAB's claim. The record in the FCC rulemaking contains a statement by the broadcasters that they would have no claim to royalties resulting from elimination of the syndicated exclusivity rules. Comments of the Association of Independent Television Stations, Inc. before the FCC, In the Matter of Cable Television Syndicated Program Exclusivity Rules, Docket No. 20988 (March 1, 1977). Consistent with that view, the NAB essentially played no role in the Tribunal proceedings relating to establishment of the syndex fund, leaving the field entirely to the contest between the syndicators and cable operators. When the broadcasters entered into the contracts upon which they rely so heavily, therefore, they knew that the exclusivity rules might be eliminated before the contracts expired. They also knew at various pertinent times that the syndicators had, through efforts before the FCC and the Tribunal, positioned themselves to claim the entirety of any syndex royalties (but for the Music Claimants) authorized by the Tribunal. We therefore believe the Tribunal was entitled to assume, particularly in light of NAB's failure to put any of the contracts in the record, that broadcasters were fully aware that an uncompensated loss of exclusivity rights was likely to occur before the contracts expired. This awareness is at odds with the argument that the contract price was intended to cover such rights for the full term. Because NAB's claim to syndex royalties is founded on the latter view of the contracts in question, it must be rejected.
 
 C. Other Claims of Error
 
 42
 The remainder of petitioners' arguments involve various fact-based challenges to the particular royalty percentages set by the Tribunal. Because none of these claims comes close to establishing that the Tribunal's allocations are unreasonable in light of its unusual statutory responsibilities and the inevitable degree of arbitrariness in royalty determinations, we decline to discuss them in detail.
 
 
 43
 The Canadian Claimant's challenge to the basic fund award merits brief explicit consideration. The Tribunal has awarded the Canadian Claimants 0.75% of the basic fund in previous distribution proceedings. As they have attempted unsuccessfully to establish in the past, see NAB v. CRT II, 772 F.2d at 935-36 (seeking an increase based on new evidence in the 1980 proceedings), the Canadian Claimants argue that new evidence that they presented in the 1983 proceedings required an increase in their basic fund award. Specifically, they maintain that the Tribunal should have recognized for the first time the marketplace value of French-language programming.
 
 
 44
 The Canadians particularly challenge the lack of an award for French-language programming, noting the D.C. Circuit's cautionary words:
 
 
 45
 [W]e will scrutinize carefully, within the limited scope of our review under the APA, the Tribunal's determination that a claimant's retransmitted works are of such negligible marketplace value and/or of such negligible benefit to cable operators that no award at all is reasonable.
 
 
 46
 CBN v. CRT, 720 F.2d at 1305. However, this "caveat" referred specifically to "the Tribunal's failure to award several claimants any shares of the Fund at all." Id. at 1304. Here, while the Tribunal refused to accord any value to one aspect of the Canadians' programming--French-language signals--the Tribunal's overall distribution of 0.75% of the basic fund and 0.25% of the 3.75% fund to Canadian Claimants clearly cannot be characterized as "no award." Accordingly, we need not heighten our level of scrutiny of the Canadian Claimants' basic fund award.
 
 
 47
 The new evidence presented by Canadian Claimants in 1983 consisted primarily of a "qualitative" survey of cable operators in twenty-five of the nation's approximately 1,570 "Form 3" cable systems.[13] All twenty-five cable operators carried Canadian programs, and were questioned only about that programming. The Tribunal found this survey flawed, however, in that it encouraged only positive responses about Canadian programming and provided no comparison of the value of that programming relative to other programming. See NAB v. CRT II, 772 F.2d at 935 ("[Tlhe issue is not whether the Canadians objectively improved the quality of their evidentiary submissions, but rather whether any such improvement was sufficient to warrant an award from the 1980 fund greater than the 1979 award, in light of the submissions made by other claimants."). The Tribunal's rejection of the Canadians' new survey was thus within the zone of reasonableness.
 
 
 48
 The Canadian Claimants' other arguments are similarly unpersuasive. The Tribunal has consistently rejected the use of any fee-generated formula as a mechanical means for allocating royalties, and instead has based its distributions on all of the relevant data presented. See, e.g., 51 Fed.Reg. at 12,808; 47 Fed Reg. 9879, 9894 (1982) (1979 proceeding); 45 Fed.Reg. 63,026, 63,035 (1980) (1978 proceeding). Thus, evidence of mere carriage does not compel distribution to the Canadians of royalties generated by French-language programming. The remainder of the Canadians' case hinges on the testimony of one Francophile cable subscriber and a Sports Claimants' cable operator. Neither of these is sufficient as a matter of law to require a change in the Tribunal's 1980 conclusion that French-language programming has no significant value to American cable systems. See NAB v. CRT II, 772 F.2d at 936.
 
 
 49
 We conclude that the Tribunal's 1983 cable royalty allocations were well within the "zone of reasonableness" in all other respects not discussed above. Accordingly, petitioners' other claims of error are without merit. We answer their challenges en masse by adopting the following admonition of the District of Columbia Circuit:We emerge from our analysis of these inherently subjective judgment calls and rough balancing of hotly competing claims with one overriding conclusion: it is the Tribunal which Congress, for better or worse, has entrusted with an unenviable mission of dividing up the booty among copyright holders.... [W]ith today's decision joining the ranks of our two prior exercises of review, the broad discretion necessarily conferred upon the Copyright Royalty Tribunal in making its distributions is emphatically clear. We will not hesitate henceforth, should this tack of litigation-to-the-hilt continue to characterize the aftermath of CRT distribution decisions, to refrain from elaborately responding to the myriad of claims and contentions advanced by a highly litigious copyright-owner subculture.
 
 
 50
 NAB v. CRT II, 772 F.2d at 940.
 
 
 51
 The Tribunal's decision is upheld in all respects, and the petitions for review are denied.
 
 
 
 *
 The Honorable Jose A. Cabranes, United States District Judge for the District of Connecticut, sitting by designation
 
 
 [1]
 Generally speaking, distant signals are originated by television stations outside the local market in which the cable system is located. Cable systems also carry a wide variety of programming not at issue here, such as satellite-delivered movie and sports channels
 
 
 [2]
 The Act provides that cable royalty claimants "may agree among themselves as to the proportionate division" of the Fund. 17 U.S.C. Sec. 111(d)(5)(A). If, however, after the first day of August of each year, the Tribunal finds that some or all parties are not in agreement, it must conduct a "proceeding" to determine the proper distribution of the controverted portion of the fund. Id. Sec. 111(d)(5)(B)
 
 
 [3]
 In Malrite T.V. we described the operation of the syndicated exclusivity rules:
 [I]n the top 50 markets, at the request of a local station, cable operators must delete all syndicated programs under exclusive exhibition contract to the requesting station, regardless of when the program is scheduled for showing on the local station, and program copyright owners can request deletion for one year after the first syndicated sale of the program, even if no local station has the rights to exhibit it. In the second 50 markets, distant syndicated programs need not be deleted if broadcast in prime time unless the requesting local station is also planning to air the program in prime time, and exclusivity rights expire at specified time periods or on the occurrence of specified events, depending on the nature of the program, e.g., first-run syndicated series and feature films are protected for two years while reruns of network series are protected for only one year. Only systems in the top 100 markets are subject to these rules.
 652 F.2d at 1145 n. 5.
 
 
 [4]
 NAB's Phase II claim as a member of the Program Supplier category must be distinguished from NAB's Phase I claim, see infra, where NAB competed with the Program Suppliers for royalties from the syndex fund. NAB's Phase II claim derives from the small number of syndicated programs produced by local broadcast stations; in Phase I, NAB represented the stations in their capacity as broadcasters, rather than as producers
 
 
 [5]
 NAB does not challenge the Tribunal's award of 4.50% of the syndex fund to Music Claimants for the use of music in syndicated programs
 
 
 [6]
 Devotional Claimants withdrew their petition for review but retained the right to raise the same arguments as a party intervenor. In addition, Devotional Claimants filed a separate intervenor's brief to oppose MPAA's attempt to reduce their basic and 3.75% fund awards
 
 
 [7]
 Devotional Claimants concede that parties such as Joint Sports Claimants, PBS, and Canadian Claimants, whose programming was never subject to the syndicated exclusivity rules, are not eligible to receive fees generated by the syndex surcharge. Similarly, because cable carriage of noncommercial educational stations was not limited by the old distant signal rules, PBS is not eligible for royalties at the new 3.75% rate
 
 
 [8]
 The Tribunal noted that it would prefer a more extensive record in subsequent proceedings regarding the relative worth of Phase II claimants' programming at the various royalty rates. 51 Fed.Reg. at 12,818
 
 
 [9]
 Section 106 of the 1976 Act lists the specific exclusive rights that comprise a copyright. These include the rights
 (1) to reproduce the copyrighted work in copies or phonorecords;
 (2) to prepare derivative works based upon the copyrighted work;
 (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
 (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
 (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.
 17 U.S.C. Sec. 106. Cable retransmissions are recognized as public performances under Sec. 106(4). See, e.g., WGN Continental Broadcasting Co. v. United Video, Inc., 693 F.2d 622, 625 (7th Cir.1982); Eastern Microwave, Inc. v. Doubleday Sports, Inc., 691 F.2d 125, 128 (2d Cir.1982), cert. denied, 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 467 (1983).
 
 
 [10]
 The Tribunal reasoned that because broadcasters may no longer obtain syndicated exclusivity rights, they cannot be copyright owners within the meaning of Section 111(d)(4). However, that argument would also preclude the syndicators from claiming the syndex fund because they also can no longer sell or exercise syndicated exclusivity rights
 
 
 [11]
 The present record contains evidence that the broadcasters have actually benefited from the elimination of the exclusivity rules. See, e.g., J.A. 257 (independent station ratings in top 20 markets increased after repeal); J.A. 278 (independent station advertising revenues in top 20 markets increased after repeal)
 
 
 [12]
 The record in the present proceeding suggests that such losses to syndicators are improbable
 
 
 [13]
 Form 3 cable systems are those that grossed more than $214,000 semiannually and paid royalties based on the type of distant signal they carried. 51 Fed.Reg. at 12,797