**NATIONAL FOOTBALL LEAGUE,**
**Plaintiff–Appellee,**

v.

**PRIMETIME 24 JOINT VENTURE,**
**Defendant–Appellant.**

**Docket Nos. 99–9244, 99–9388**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 25, 2000

Decided: April 28, 2000

Neil K. Roman, Covington & Burling, Washington, DC (John Vanderstar, Ronald G. Dove, Jr., Covington & Burling, Washington, DC, Eric Seiler, Robert ʾS. Loigman, Friedman Kaplan & Seiler LLP, New York, NY, on the brief), for Plaintiff–Appellee.

Brandon F. White, Foley, Hoag & Eliot LLP, Boston, MA (Kenneth S. Leonetti, Lawrence H. Martin, Foley, Hoag & Eliot LLP, Boston, MA, Roger L. Zissu, Craig S. Mende, Fross Zelnick Lehrman & Zissu, P.C., New York, NY. on the brief), for Defendant–Appellant.

Professor William Patry, Benjamin N. Cardozo School of Law, New York, NY, submitted a brief for ABC, Inc., CBS Broadcasting Inc., Fox Broadcasting Com-

pany, Inc., and National Broadcasting Company, Inc., amici curiae.

Jeffrey A. Mishkin, Richard W. Buchanan, National Basketball Association, New York, NY, Kenneth A. Plevan, Scott D. Brown, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, submitted a joint brief for National Basketball Association, Office of the Commissioner of Baseball, National Hockey League, and Motion Picture Association of America, Inc., amici curiae.

Before: VAN GRAAFEILAND, STRAUB and POOLER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

As almost every red-blooded American knows, the National Football League ("NFL") televises most of its weekly football games. Simultaneously with the broadcast, NFL makes videotape recordings of the games, which it registers with the United States Copyright Office.

PrimeTime 24 Joint Venture ("Prime-Time") is a satellite carrier that makes secondary transmissions of copyrighted television network programming to owners and renters of satellite dish antennae. PrimeTime has a statutorily granted license to make satellite transmissions to its subscribers in United States households that do not have adequate over-the-air broadcast reception from primary television stations, i.e., "unserved" households. See generally 17 U.S.C. § 119. However, PrimeTime has not limited its retransmissions to unserved households in the United States. Without securing permission from NFL, PrimeTime also makes secondary transmissions of football broadcasts to its satellite subscribers in Canada.

On several occasions in 1997, NFL officials wrote to PrimeTime demanding that this practice stop. The following excerpt from one of PrimeTime's replies explains why PrimeTime believes it has the right to continue this practice:

> Next, I would like to address your assertion that the provision of PrimeTime 24's service to subscribers in Canada infringes your copyright in the United States, notwithstanding the facts that all of the recipients in question are in Canada, and PrimeTime 24's actions in this regard comport with applicable Canadian law. Under United States copyright law, the NFL is entitled to control the "public" display or performance of any audiovisual work for which it holds a valid copyright. Accordingly, there can be no infringement of the NFL's rights unless and until there has been a public display or performance. Because the copyright laws of the United States have no extraterritorial applicability, "public" performances that occur in other countries cannot trigger liability for copyright infringement under the laws of the United States. Instead, the law of the country in which the public performance does take place protects the copyright holder.

Letter from Sid Amira, Chairman and Chief Executive Officer of PrimeTime, to Frank Hawkins, Vice President of NFL (Aug. 8, 1997).

PrimeTime's continued retransmission of NFL programming into Canada resulted in the litigation now before us. By a memorandum and order dated March 23, 1999, the United States District Court for the Southern District of New York (McKenna, J.) denied PrimeTime's motion to dismiss NFL's complaint. By a decision dated September 24, 1999, the district court granted NFL's motion for summary judgment and referred the case to a magistrate judge for calculation of fees and damages. On October 18, 1999, the district court issued an order permanently enjoining PrimeTime from retransmitting telecasts of NFL football games outside the United States. PrimeTime asks us to reverse the final injunction.

Under the Copyright Act, the owner of a copyright has the exclusive right publicly to perform and display the copyrighted material. 17 U.S.C. § 106(4) & (5). The

Act explains that the right to perform copyrighted material publicly includes the right "to transmit or otherwise communicate a performance ... of the work ... to the public, by means of any device or process, whether the members of the public capable of receiving the performance ... receive it in the same place or in separate places and at the same time or at different times." *Id.* § 101. Congress stated that "[e]ach and every method by which [ ] images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and if the transmission reaches the public in [any] form, the case comes within the scope of [§ 106(4) or (5) ]." H.R.REP. No. 94–1476, at 64 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5678.

■ The issue in this case is whether PrimeTime publicly performed or displayed NFL's copyrighted material. PrimeTime argues that capturing or uplinking copyrighted material and transmitting it to a satellite does not constitute a public display or performance of that material. PrimeTime argues that any public performance or display occurs during the downlink from the satellite to the home subscriber in Canada, which is in a foreign country where the Copyright Act does not apply. Although this Court has not squarely resolved the issue, several courts have rejected PrimeTime's reasoning.

In *WGN Continental Broadcasting Co. v. United Video, Inc.*, 693 F.2d 622, 624–25 (7th Cir.1982), the Seventh Circuit considered whether an intermediate carrier had publicly performed copyrighted television signals by capturing broadcast signals, altering them and transmitting them to cable television systems. The court determined that "the Copyright Act defines 'perform or display ... publicly' broadly enough to encompass indirect transmission to the ultimate public." *Id.* at 625. Consequently, the *WGN* court concluded that an intermediate carrier is not immune from copyright liability simply because it

does not retransmit a copyrighted signal to the public directly but instead routes the signal to cable systems, which then retransmit to the public. *Id.*

Judge Posner, writing for the court in *WGN*, noted that a contrary result would render the passive carrier exemption in the Act superfluous. *Id.* The passive carrier exemption provides that a secondary transmission is not copyright infringement if the transmitter has no control over the content or selection of the original signal or over the recipients of the secondary transmission and provides only the wires, cables, or communication channels for the use of others. *See* 17 U.S.C. § 111(a)(3). In other words, if a copyrighted signal is publicly performed or displayed only when received by viewers, there would be no need for a passive carrier exemption because these passive intermediate carriers "do not transmit directly to the public." *WGN*, 693 F.2d at 625. A district court in the Eighth Circuit has reached the same result. *See Hubbard Broadcasting, Inc. v. Southern Satellite Systems, Inc.*, 593 F.Supp. 808, 813 (D.Minn.1984), *affirmed*, 777 F.2d 393 (8th Cir.1985) (finding secondary transmissions to be public performances whether made directly or indirectly to public).

District courts in this Circuit have agreed that a transmission need not be made directly to the public in order for there to be a public performance or display. For example, in *David v. Showtime/The Movie Channel, Inc.*, 697 F.Supp. 752, 759 (S.D.N.Y.1988), Judge Tenney concluded that "Congress intended the definitions of 'public' and 'performance' to encompass each step in the process by which a protected work wends its way to its audience." Judge Tenney further stated that the definition of transmit "is broad enough to include *all conceivable forms and combinations* of wired or wireless communications media." *Id.* at 758–59 (quoting H.R.REP. No. 94–1476, at 64).

Other district courts have relied on *David* to reach the same conclusion. *See*

*National Cable Television Ass'n, Inc. v. Broadcast Music, Inc.,* 772 F.Supp. 614, 650–51 (D.D.C.1991) (citing analysis in *David* with approval); *Coleman v. ESPN, Inc.,* 764 F.Supp. 290, 294 (S.D.N.Y.1991) ("Transmissions by a cable network or service to local cable companies who in turn transmit to individual cable subscribers constitute 'public performances' by the network."); *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Servs.,* 746 F.Supp. 320, 328–29 (S.D.N.Y. 1990) (finding public performance when cable supplier transmitted signal to cable operator that then relayed signal to viewers); *see also National Ass'n of Broadcasters v. Copyright Royalty Tribunal,* 809 F.2d 172, 179 n. 9 (2d Cir.1986) (noting that cable retransmissions are recognized as public performances under § 106(4)).

The Court of Appeals for the Ninth Circuit has suggested a different result. When considering whether the Copyright Act preempted state law, that Court stated that copyright infringement does not occur until the signal is received by the viewing public. *See Allarcom Pay Television, Ltd. v. General Instrument Corp.,* 69 F.3d 381, 387 (9th Cir.1995). This opinion has been subject to some non-judicial criticism, which we need not repeat. *See* Jane C. Ginsburg, *Extraterritoriality and Multiterritoriality in Copyright Infringement,* 37 VA. J. INT'L L. 587, 598 (1997); Andreas P. Reindl, *Choosing Law in Cyberspace: Copyright Conflicts on Global Networks,* 19 MICH. J. INT'L L. 799, 823 n. 84 (1998). We accord the decision little weight largely because it contains no analysis of the Copyright Act.

■ We believe the most logical interpretation of the Copyright Act is to hold that a public performance or display includes "each step in the process by which a protected work wends its way to its audience." *David,* 697 F.Supp. at 759. Under that analysis, it is clear that PrimeTime's uplink transmission of signals captured in the United States is a step in the process by which NFL's protected work wends its way to a public audience. In short, Prime-

Time publicly displayed or performed material in which the NFL owns the copyright. Because PrimeTime did not have authorization to make such a public performance, PrimeTime infringed the NFL's copyright.

We do not rely on the Satellite Home Viewer Act ("SHVA"), 17 U.S.C. § 119, in arriving at this conclusion. Both parties contend that the Act's creation of a statutory copyright license for certain United States households supports their interpretation of the Copyright Act with respect to PrimeTime's Canadian subscribers. An examination of the congressional reports leading to the adoption of the SHVA discloses that Congress was concerned about the "millions of Americans" who live "in areas where the reception of off-air network signals is not possible or is of unacceptable quality," and the proposed bill simply "resolves the legal issues surrounding provision of broadcast signals to rural America." TRADEMARK LAW REVISION ACT OF 1988—SATELLITE HOME VIEWER ACT OF 1988, H.R.REP. No. 100–887(II), at 6–7 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5638, 5643–44. We see no need to extract more from this "interim" statutory solution than Congress put into it.