In re Application of CELLCO
PARTNERSHIP d/b/a
Verizon Wireless.

Related to

United States of America, Plaintiff

v.

American Society of Composers, Authors, and Publishers, Defendant.

Nos. 09 Civ. 7074(DLC)(MHD),
41 Civ. 1395(DLC).

United States District Court,
S.D. New York.

Oct. 14, 2009.

David Leichtman, Hillel Parness, Eleanor Lackman, Lovells LLP, Richard Reimer, Christine Pepe, American Society of Composers, Authors, and Publishers, New York, NY, for American Society of Composers, Authors, and Publishers.

Bruce Joseph, Andrew McBride, Michael Sturm, Wiley Rein LLP, Washington, DC, for Cellco Partnership d/b/a Verizon Wireless.

Michael Salzman, Jessica Feldman, Hughes Hubbard & Reed LLP, Marvin Berenson, Joseph DiMona, John Coletta, Broadcast Music, Inc., New York, NY, for Amicus Curiae Broadcast Music, Inc.

Andrea Williams, CTIA—The Wireless Association, Washington, DC, Bruce Keller, Jeffrey Cunard, Michael Potenza, Richard Lee, Debevoise & Plimpton LLP, New York, NY, for Amicus Curiae CTIA—The Wireless Association.

Gary Shapiro, Consumer Electronics Association, Arlington, VA, for Amicus Curiae Consumer Electronics Association.

Lee Knife, Digital Media Association, Washington, DC, for Amicus Curiae Digital Media Association.

Michael Elkin, Thomas Lane, Winston & Strawn, New York, NY, Fred von Lohman, Electronic Frontier Foundation, San Francisco, CA, for Amici Curiae Electronic Frontier Foundation, Public Knowledge, and Center for Democracy and Technology.

Heidi Salow, DLA Piper, Washington, DC, for Amicus Curiae Internet Commerce Coalition.

C. Paul Spurgeon, Society of Composers, Authors, and Music Publishers of Canada, Toronto, Ontario, Canada, Al Daniel, Jr., Toby Butterfield, Christopher Marino, New York, NY, for Amicus Curiae Society of Composers, Authors, and Music Publishers of Canada.

Kenan Popwell, Society of European Stage Authors & Composers, Inc., New York, NY, John Beiter, Zumwalt, Almon & Hayes PLLC, Nashville, TN, for Amicus Curiae Society of European Stage Authors & Composers, Inc.

Jonathan Banks, United States Telecom Association, Washington, DC, for Amicus Curiae United States Telecom Association.

### OPINION & ORDER

DENISE COTE, District Judge:

This summary judgment motion presents the question of whether a retail wireless communications company requires a public performance license for musical compositions because it provides ringtones to its customers. For the following reasons, it does not.

### BACKGROUND

■ Cellco Partnership d/b/a Verizon Wireless ("Verizon") began this proceeding by filing its January 23, 2009 application for a determination of reasonable fees for a blanket license for the public performance of musical compositions in the repertory of the American Society of Composers, Authors, and Publishers ("ASCAP").[1]

---

1. Pursuant to a consent decree stemming from antitrust litigation filed by the United States Department of Justice against ASCAP in 1941, this Court sits as a rate court to resolve disputes over ASCAP's licensing fees for the public performance of its members' musical works.

Verizon is a retail wireless communications company. ASCAP is a performing rights organization that licenses on a non-exclusive basis the non-dramatic public performance rights to musical works.[2]

Verizon sells ringtones, amongst other products and services. A ringtone is "a digital file of a portion of a musical composition or other sound" that is designed to be played by a customer's telephone in order to signal an incoming call in the same manner as would a telephone ring. A customer can download a ringtone either from the internet or through a Verizon telephone. To obtain a ringtone from Verizon, a customer must purchase it and download it to a cellular telephone.[3] Downloading a typical thirty-second ringtone takes a matter of seconds. A ringtone cannot be played while it is being downloaded. After a ringtone has been downloaded, a digital file appears on the customer's telephone. The customer can listen to the downloaded ringtone by clicking on the digital file, but only after it has been fully downloaded.

After a ringtone is downloaded, the underlying audio file is stored on the telephone. A customer can then set her telephone to play the ringtone when her telephone receives an incoming call. The customer determines whether and where a ringtone will play when she receives a call by controlling whether her telephone is on or off, whether the telephone is set to indicate an incoming call by playing a ringtone or by some other method (e.g., normal ringing, vibrating), and where the telephone is at any given point. When a ringtone rings, the music or sound clip plays from the file stored on the telephone.

Verizon's role in playing a ringtone is that it sends a signal to a customer's telephone to indicate an incoming call. That signal is the same regardless of whether or not the customer has set her telephone to indicate an incoming call with a ringtone. Verizon does not monitor when and where customers' ringtones play, and it does not earn any money from ringtones beyond the fee paid for the initial download transaction.

On May 22, 2009, Verizon filed this motion for summary judgment on the question of whether it must pay public performance licensing fees for ringtones.[4]

---

The Second Amended Final Judgment entered in the United States' civil antitrust action against ASCAP ("AFJ2") provides in Section IX that anyone desiring a license for the public performance of any ASCAP musical composition may apply to ASCAP therefor and, upon such application, may perform the music for fees to be determined later. Section IX further provides that if the parties cannot agree on the fee for such license, either party may apply to this Court to set reasonable interim and final fees. *United States v. Am. Soc'y of Composers, Authors and Publishers*, 616 F.Supp.2d 447, 448 (S.D.N.Y. May 13, 2009) (Conner, J.) (citation omitted).

2. ASCAP is prohibited from "acquiring exclusive music performing rights" from its members and from "interfering with the right of any member to issue to any user a non-exclusive license for music performing rights."

*Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors and Publishers*, 744 F.2d 917, 923 (2d Cir.1984).

3. Pursuant to a ruling by Copyright Royalty Judges, Verizon pays songwriters and music publishers a royalty of 24 cents per each download of a ringtone for the reproduction and distribution of their musical works. This is more than two times the royalty rate it pays them for permanent downloads of entire songs through programs such as iTunes. That royalty rate is 9.1 cents per each download of a song. *In the Matter of Mech. & Digital Phonorecord Delivery Rate Adjustment Proceeding*, No. RF 2006–3, 74 Fed.Reg. 4510, 4510 & 4526 (C.R.B. Jan. 26, 2009); 37 C.F.R. § 385.3(b).

4. Verizon's 2009 application to ASCAP for a non-exclusive blanket license for the public

Verizon filed its reply on June 25. On July 22, this case was reassigned to this Court. Parties were given leave to file supplemental letters discussing recent developments in the law, which became fully submitted on August 28.

DISCUSSION

ASCAP argues that Verizon engages in public performances of musical works when it downloads ringtones to customers. In addition, ASCAP argues that Verizon is both directly and secondarily liable for public performances of musical works when customers play ringtones on their telephones. Verizon seeks summary judgment in its favor on each theory of liability.

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Roe v. City of Waterbury*, 542 F.3d 31, 35–36 (2d Cir.2008). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings. Fed.R.Civ.P. 56(e); *accord Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.2009). That is, the nonmoving party "must do

more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over material facts—facts that might affect the outcome of the suit under the governing law—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Roe*, 542 F.3d at 35.

■■■ The protection given to copyrights is wholly statutory. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). The Copyright Act does not give a copyright owner control over all uses of his work, but instead grants " 'exclusive' rights to use and to authorize the use of his work" in the specific ways enumerated in the statute. *Id.* at 432–33, 104 S.Ct. 774.

■■■ The rights at issue in this litigation constitute only one of the many rights created by the copyright statute. To begin with, there are separate bundles of rights in a musical composition and in its embodiment in a sound recording. "Copyright protection subsists ... in original works of authorship fixed in any tangible medium of expression," including "musical works" and "sound recordings."[5] 17 U.S.C. § 102. "Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights." *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1197

performance of musical works sought a license for ringback tones and content streamed over its "VCAST" service. The application did not identify ringtones.

5. Sound recordings are "works that result from the fixation of a series of musical, spo-

ken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. § 101.

n. 3 (10th Cir.2005). Whereas "[t]he author of a musical composition is generally the composer, and the lyricist, if any," "[t]he author of a sound recording is the performer(s) whose performance is fixed, or the record producer who processes the sounds and fixes them in the final recording, or both." Copyright Office Circular 56A at 1 ("Copyright Registration of Musical Compositions and Sound Recordings") (available at http://www.copyright.gov/circs/circ56a.pdf); *see also Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 571 F.3d 69, 72–73 (D.C.Cir.2009) (per curiam). ASCAP represents owners of the copyright in the musical composition only and therefore does not negotiate licenses in sound recordings.[6]

A copyright owner may hold as many as six exclusive rights. They are the rights

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, *to perform the copyrighted work publicly;*

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.[7]

17 U.S.C. § 106 (emphasis supplied).

Each of these six rights may be owned and conveyed separately. 17 U.S.C. § 201. The rights to reproduce and to distribute musical works, *see* 17 U.S.C. § 106(1) and (3), which are often referred to as mechanical rights, are governed by 17 U.S.C. § 115. *See* 9 Melville B. and David Nimmer, *Nimmer on Copyright* Appendix 16 (2009) (Chapter IX of Second Supplementary Register's Report on the General Revision of the U.S. Copyright Law (1975), entitled "Compulsory License for Making and Distributing Phonorecords ('The Mechanical Royalty')"). Disagreements over license fees for mechanical rights in a musical work are resolved by Copyright Royalty Judges, 17 U.S.C. § 115(c)(3)(C), and are not at issue here. It is only the fourth right in 17 U.S.C. § 106 that will be addressed in this Opinion.

ASCAP licenses only the public performance right in musical works established in 17 U.S.C. § 106(4). *Buffalo Broad. Co., Inc. v. Am. Soc'y of Composers, Authors and Publishers*, 744 F.2d 917, 920 (2d Cir.1984). This Opinion addresses whether 17 U.S.C. § 106(4) requires Verizon to pay ASCAP a public performance license fee for ringtones.

---

**6.** Sound recordings are "derivative" works of the preexisting musical composition, and to obtain a copyright in a sound recording one must secure a license from the copyright owner of the underlying work. The mechanical rights for sound recordings under § 106(1) and (3) are subject to compulsory licensing under the regime established in 17 U.S.C.

§ 115. *See Palladium*, 398 F.3d at 1197, 1199.

**7.** The sound recording copyright did not include a right of performance until recently. *See Arista Records v. Launch Media, Inc.*, 578 F.3d 148, 152–55 (2d Cir.2009) (describing statutes creating public performance rights in sound recordings).

Several of the terms relevant to a construction of § 106(4) are defined in 17 U.S.C. § 101. Under § 101, to "perform" a work means "to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." To perform a work "publicly" means:

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) *to transmit or otherwise communicate a performance* or display of the work to a place specified by clause (1) or *to the public, by means of any device or process,* whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101 (emphasis supplied). To "transmit" a performance is "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." *Id.*

The Copyright Act includes exemptions for certain public performances of copyrighted music. Subsection 110(4) of Title 17 provides that the following performances do not constitute a public performance for the purposes of the Copyright Act and therefore do not require a public performance license:

[any] performance of a nondramatic literary or musical work otherwise than in a transmission to the public, without any purpose of direct or indirect commercial advantage and without payment of any fee or other compensation for the performance to any of its performers, promoters, or organizers, if [ ] there is no direct or indirect admission charge. . . .

17 U.S.C. § 110(4).

■ To be held liable for direct infringement of the public performance right, a defendant must have engaged in conduct that is volitional or causally related to that purported infringement. *Cartoon Network LP v. CSC Holdings, Inc.,* 536 F.3d 121, 130–31 (2d Cir.2008) (considering infringement under 17 U.S.C. § 106(1)). In other words, to impose direct liability, there must be a "nexus sufficiently close and causal to the illegal [infringement] that one could conclude that the [defendant] himself trespassed on the exclusive domain of the copyright owner." *Id.* at 130 (citation omitted).

■ A defendant may also be secondarily liable for another's public performance of a copyrighted musical work. While "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," it "does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity." *Sony,* 464 U.S. at 434–35, 104 S.Ct. 774. Through contributory infringement, one infringes "by intentionally inducing or encouraging direct infringement." *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005). Vicarious infringement exists where one "profit[s] from direct infringement while declining to exercise a right to stop or limit it." *Id.* As these definitions suggest, in order to hold a defendant secondarily liable someone else must have directly infringed the public performance right. *See id.* at 940, 125 S.Ct. 2764 ("[T]he inducement theory of course requires evidence of actual infringement by recipients of the device."); *Faulkner v. Nat'l Geographic Enters. Inc.,* 409 F.3d

26, 40 (2d Cir.2005) ("[T]here can be no contributory infringement absent actual infringement."); *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir.1998) (rejecting plaintiff's contributory infringement claim, in part, because the plaintiff "has failed to identify any primary infringer").

### 1. Downloading Ringtones

 ASCAP contends that Verizon's transmission of a ringtone to a customer's cellular telephone requires a public performance license. While it is undisputed that the act of reproducing and distributing a ringtone implicates the mechanical rights in a musical work created by the Copyright Act, ASCAP asserts that the transmission of a ringtone to a customer's cellular telephone is also a public performance of a musical work governed by 17 U.S.C. § 106(4). Based on undisputed facts, however, Verizon has shown that its transmission of a ringtone to a cellular telephone customer does not constitute a performance of a musical work "publicly," as that term is defined in 17 U.S.C. § 101.

The parties agree that this question does not implicate the first clause of the definition of the term "publicly" contained in § 101, and focus their arguments instead on its second clause (hereinafter "Transmission Clause"), which reads in pertinent part:

> (2) to transmit or otherwise communicate a performance ... by means of any device or process, whether the members of the public capable of receiving the

performance or display receive it in the same place or in separate places and at the same time or at different times. 17 U.S.C. § 101. Boiled down to its essence, the question becomes whether in downloading a ringtone to a customer's cellular telephone Verizon transmits a performance of the work to the public.

 In analyzing whether the transmission to a cellular telephone qualifies as a transmission of the work to the public, the focus is on the transmission itself and its potential recipients, and not on the potential audience of the underlying work or ringtone that rests on Verizon's file servers.[8] *Cartoon Network*, 536 F.3d at 134–35. As the Second Circuit has explained, since the Transmission Clause speaks of those "capable of receiving the performance," instead of those "capable of receiving the transmission," it is the "transmission of a performance that is itself a performance" for purposes of § 101. *Id.* at 134. Because only one subscriber is capable of receiving this transmission or performance, the transmission is not made to the public and is not covered by the Transmission Clause, at least when considered by itself. This transmission of a "unique copy ... limit[s] the potential audience of a transmission and is therefore relevant to whether that transmission is made 'to the public.'" *Id.* at 138.

Because the Transmission Clause "directs us to identify the potential audience of a given transmission, i.e., the person 'capable of receiving' it, to determine whether that transmission is made 'to the

---

8. In *Buffalo Broadcasting*, the Court of Appeals observed in passing, while considering whether local television stations needed to obtain a public performance license for musical works contained in syndicated programs, that a producer of a syndicated program did not need to acquire such a license to either make or sell the program to the television station. *Buffalo Broad.*, 744 F.2d at 921–22. Only the station needed to obtain such a license, and it usually did so by obtaining a blanket license from ASCAP and ASCAP's rival BMI. *Id.* at 922. This example illustrates that the distribution and sale of a musical work and the public performance of the work implicate separate rights, and it is only the last which requires a public performance license under § 106(4).

372

public,' " *id.* at 139, and because one may look downstream and consider whether the transmission of the ringtone to the cellular telephone is but one link in a chain of transmissions to the public, *id.* at 137, ASCAP also urges that the downloading of the ringtone is but the first link in a chain of transmission to the public. As described below, however, there is no qualifying public performance under § 106(4) when the customer uses the ringtone to alert her to an incoming call. Thus, even when the downloading of a ringtone is considered as the first link in a chain of transmissions, it does not qualify as a public performance.[9]

This analysis flows from the Court of Appeals' recent decision in *Cartoon Network*, 536 F.3d 121. There, owners of copyrighted television programs alleged that Cablevision's Remote Storage Digital Video Recorder ("RS–DVR") system infringed their exclusive rights to the reproduction and public performance of the copyrighted works. The RS–DVR system allowed a Cablevision customer to record cable television programs onto hard drives stored in a remote location, and to receive a playback transmission of the recorded programs from the remote hard drive to his home television. The Second Circuit considered whether the recording of the program on the RS–DVR constituted an unauthorized reproduction and whether the playback of the program constituted an unauthorized public performance, in violation of §§ 106(1) and (4), respectively.

While *Cartoon Network* was not required to address the public performance right in the context of the transmission of the program to the RS–DVR, the act most analogous to the downloading of a ringtone,[10] its discussion of the Transmission Clause has important ramifications for that step in the transmission to the customer as well.[11] Indeed, in its discussion of *National Football League v. PrimeTime 24 Joint*

9. ASCAP refers to several decisions for the proposition that Verizon is liable for each step in the transmission process leading to a public performance since it has "control over the entirety of the process from server to listening ears." As discussed *infra*, Verizon does not control when or where the ringtone will be played and whether it will be heard "publicly." Its lack of control at the point of performance stands in sharp contrast to several of the cases on which ASCAP relies for this proposition; in every instance but one, these courts also found or assumed that a public performance license was necessary at the point at which the performance was displayed to the public. *See National Football League v. Primetime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir.2000) (satellite broadcast to television audience); *WGN Cont's Broad. Co. v. United Video, Inc.* 693 F.2d 622, 625 (7th Cir.1982) (delivery of television programs over cable television systems); *Columbia Pictures Indus. v. Aveco*, 800 F.2d 59, 62 (3d Cir.1986) (video cassettes shown in individual viewing rooms within video store which rented the rooms and cassettes); *David v. Showtime/The Movie Channel, Inc.*, 697 F.Supp. 752 (S.D.N.Y.

1988) (transmission of programming to cable system operators); *Hubbard Broad., Inc. v. Southern Satellite Sys.*, 593 F.Supp. 808, 813 (D.Minn.1984) (transmission of television programming to cable television systems). The sole exception to the requirement of a license at the point of performance is *NFL*, 211 F.3d 10, which is discussed further *infra*.

10. It bears noting, however, that Verizon's ringtone is downloaded to a customer's telephone while the programming at issue in *Cartoon Network* resided in Cablevision's hard drives.

11. *Cartoon Network* distinguished cases in which the same copy of a copyrighted work was watched by a succession of individuals. *Cartoon Network*, 536 F.3d at 138–39 (distinguishing *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 159 (3d Cir. 1984) (video rental store played videotapes in private booths); *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F.Supp. 787 (N.D.Cal.1991) (hotel plays videotapes for guests in their individual hotel rooms *in seriatim* )).

*Venture,* 211 F.3d 10 (2d Cir.2000) ("*NFL*"), the Court of Appeals observed that the transmission to the RS–DVR could only be considered a transmission "to the public" where it is but one link in a chain whose "final link was undisputedly a public performance." *Cartoon Network,* 536 F.3d at 137.[12]

Over a year before the decision in *Cartoon Network* was issued, the Honorable William C. Conner, who presided over this litigation with distinction for many years, used a different analysis of the Transmission Clause to arrive at a similar result. He held that downloading music from server computers (operated by AOL LLC and others) to a client computer was not a public performance of a musical work. *United States v. Am. Soc'y of Composers, Authors and Publishers,* 485 F.Supp.2d 438, 441–42 (S.D.N.Y.2007) (hereinafter "*Download Decision*"). Judge Conner began with the Transmission Clause's requirement that a "performance" of the work had to be transmitted, then turned to the Copyright Act's definition of "perform," 17 U.S.C. § 101, and concluded that "in order for a song to be *performed,* it must be transmitted in a manner designed for contemporaneous perception." *Id.* at 443 (emphasis supplied). Since the downloading of music was effected by copying a digital file "from one computer to another in the absence of any perceptible rendition," *id.* at 444,[13] Judge Conner classified the transaction as "a data transmission rather than a musical broadcast" or performance, *id.* at 446, and an act more properly categorized as a reproduction of a work governed by § 106(1), *id.* at 444, or a digital phonorecord delivery as described in 17 U.S.C. § 115(d). *Id.* at 447.

Both the *Cartoon Network* decision and the *Download Decision* required the plaintiff to show a linkage between the transmission and a public performance. The application of the line of analysis used in each case, would have led to the same finding in both cases, to wit, that the respective transmissions were not covered by the Transmission Clause because the transmissions did not cause a public performance to take place. And, although *Cartoon Network* relies on the meaning of the phrase "the public" and the *Download Decision* explores the meaning of the term "performance," application of the analysis used in either decision would result in an identical conclusion here: the downloading of a ringtone is not a public performance encompassed by the Transmission Clause.

 In sum, where there is a transmission of the performance of a musical

---

**12.** *Cartoon Network,* 536 F.3d 121, discussed *in passim NFL,* 211 F.3d 10, choosing to reconcile its holding with *NFL* and declining to revisit *NFL* 's reliability in addressing these complex issues. In *NFL,* copyrighted television programming was "uplinked" in the United States to a satellite system and then downlinked to home subscribers of the satellite service in Canada. The satellite company asserted that it needed no public performance license since there was no public display or performance of the transmission in the United States and American copyright laws have no extraterritorial applicability. The Court of Appeals found an infringement under § 106(4) since "a public performance or display includes each step in the process by which a protected work wends its way to its audience." *NFL,* 211 F.3d at 13 (citation omitted). There is a strong argument to be made that there must be a public performance that infringes rights established by the Copyright Act before an upstream transmission that is a link to that performance can itself be found to infringe § 106(4). *See* 2 Melville B. and David Nimmer, *Nimmer on Copyright* § 8.14[C][2] (2009).

**13.** Streaming, in contrast to downloading, allows the real-time playing of a work through a constant link maintained between the provider's server and the client. A replay is not possible without streaming the work again. *Download Decision,* 485 F.Supp.2d at 442.

work directly to the public, that transmission is governed by § 106(4). Where the transmission itself does not allow the public to perceive the performance as a work that is being rendered, but is only an intervening transmission in the downstream delivery of the performance to the means by which the public will be capable of receiving the performance, then that transmission may also be governed by § 106(4).[14] ASCAP has failed to raise a question of fact that the downloading of a ringtone from Verizon to a customer's cellular telephone is a public performance of a musical work under either branch of this analysis.

ASCAP's effort to escape the implications of the foregoing analysis fails. ASCAP argues that ringtones are "capable of" being heard during the downloading process. ASCAP does not contend, however, that a Verizon customer can actually listen to a ringtone while she is downloading it; it acknowledges that the ringtone cannot be played before the transmission is concluded because Verizon has constructed the transmitted file "that way." ASCAP's argument amounts to a claim that Verizon could change or enable its technology to allow a user to listen to a ringtone while downloading it. This argument is not addressed to the technology at issue in this case and does not present a factual context that is ripe for review. In any event, the *Cartoon Network* decision presents an insurmountable impediment to this argument. Even if the customer could listen to the download as it was being received, and contemporaneously

perceive it as the musical work, that would not constitute a *public* performance.

## 2. Playing Ringtones

ASCAP next argues that there is a public performance of musical works when cellular telephones play ringtones to signal incoming calls. It contends that Verizon is either directly or secondarily liable for copyright infringement for these public performances. Verizon has shown that it is entitled to summary judgement as well on these claims. When a ringtone plays on a cellular telephone, even when that occurs in public, the user is exempt from copyright liability, and Verizon is not liable either secondarily or directly.[15]

### a. Secondary Liability

ASCAP asserts that Verizon is secondarily liable when a ringtone plays. Secondary liability depends upon a finding that there has been a direct or primary infringement, and Verizon has shown that the cellular telephone user is not liable for copyright infringement even when the telephone rings in a public setting.

As already noted, the Copyright Act exempts from 17 U.S.C. § 106(4) those performances of a musical work that occur within the "normal circle of a family and its social acquaintances," 17 U.S.C. § 101 (definition of "publicly"), and further exempts

> [any] performance of a nondramatic literary or musical work otherwise than in a transmission to the public, without any

---

**14.** Where a transmission is of a digital file rather than a performance that can be contemporaneously observed or heard, and where that transmission is but a link in a chain to a downstream public performance, it may be that the transmission is not an act of infringement for which the transmitter is directly liable under § 106(4), but rather an act that may subject the transmitter to contribu-

tory liability under § 106(4) for the infringement created by any ultimate public performance.

**15.** Verizon also contends that any public performance of a ringtone constitutes fair use under the Copyright Act, but does not rely on that argument in seeking summary judgment.

purpose of direct or indirect commercial advantage and without payment of any fee or other compensation for the performance to any of its performers, promoters, or organizers, if [ ] there is no direct or indirect admission charge . . . .

17 U.S.C. § 110(4).

The expectation of profit is important to determining whether a performance fits within the § 110(4) exemption. If a performance occurs with no expectation of profit, it might qualify for this exemption if all of the statutory requirements are met; if, however, a performance occurs with the expectation of profit, even if no profit is made, the performance may not fall within this exemption. *Herbert v. Shanley Co.*, 242 U.S. 591, 595, 37 S.Ct. 232, 61 L.Ed. 511 (1917) ("Whether [the performance of music] pays or not, the purpose of employing it is profit, and that is enough."); *accord Broadcast Music, Inc. v. 315 West 44th St. Rest. Corp.*, No. 93 Civ. 8082(MBM), 1995 WL 408399, *3 (S.D.N.Y. July 11, 1995).

The playing of ringtones fits comfortably within these statutory exemptions. When a ringtone plays only in the presence of the "normal circle of a family and its social acquaintances" this performance would not count as a public performance under 17 U.S.C. § 101. On occasions when Verizon customers have activated their ringtones, the telephone rings in the presence of a broader audience, and it rings at a level to be heard by others, that playing of a musical work satisfies all of the requirements of the § 110(4) exemption: Verizon customers are not playing the ringtones for any "commercial advantage;" they do not get paid any fee or compensation for these performances; and they do not charge admission. In sum, customers do not play ringtones with any expectation of profit. The playing of a ringtone by any Verizon customers in public is thus exempt under 17 U.S.C. § 110(4) and does not require them to obtain a public performance license.

ASCAP argues that the § 110(4) exemption should not apply since "the customer benefits by purchasing a product and service it desires." This personal, non-monetary benefit does not vitiate the application of the § 110(4) exemption. The only commercial advantage that ASCAP identifies as being associated with the playing of a ringtone is a commercial benefit to Verizon, specifically, the possibility that others may be encouraged to purchase ringtones when they hear ringtones.[16] A potential commercial advantage to Verizon, however, does not suggest that its customers may not qualify for the § 110(4) exemption. To paraphrase the *Sony* Court, "[o]ne may search the Copyright Act in vain for any sign that the elected representatives of the millions of people" who own cellular telephones "have made it unlawful" to allow that telephone to ring in a public setting. *Sony*, 464 U.S. at 456, 104 S.Ct. 774.

The fact that cellular telephone users are not infringers of ASCAP's rights in the public performance of musical works defeats ASCAP's claim that Verizon is sec-

---

**16.** ASCAP's solitary example of customers playing their ringtones for what it argues was commercial advantage was the audience's use of their cellular telephones as part of the 2006 Chicago Sinfonietta "Concerto for Orchestra and Cell Phones." Even if ASCAP were able to allege that Verizon customers were in the audience of that performance, ASCAP does not allege that the Verizon cus-

tomers themselves had any "purpose of commercial advantage," received any fees, or charged admission. Rather, it appears the Chicago Sinfonietta is the entity that had the commercial purpose, received any payment or fees, and charged admission for the performance of music. And, as Verizon points out, the orchestra was licensed by ASCAP at the time of its performance.

ondarily liable for their infringement. "[T]he concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another." *Id.* at 435, 104 S.Ct. 774. Thus, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Faulkner,* 409 F.3d at 40 (citation omitted); *see also Softel, Inc. v. Dragon Med. & Scientific Communc'ns, Inc.,* 118 F.3d 955, 971 (2d Cir.1997). As already described, however, secondary liability depends on a finding that there has been a direct or primary infringement of the rights established under the Copyright Act. *Grokster,* 545 U.S. at 940, 125 S.Ct. 2764; *Faulkner,* 409 F.3d at 40; *Matthew Bender & Co.,* 158 F.3d at 706.[17]

ASCAP argues that Verizon is secondarily liable for its customers' public performances because it has failed to show that "each and every customer would be able to meet its burden of proof to show that his or her 'performance' of ringtones would satisfy the § 110(4) exemption." While a proponent of an affirmative defense ordinarily bears the burden of proving that it applies, *Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, 107 (2d Cir. 1998), since ASCAP is seeking to impose secondary liability on Verizon for its customers' conduct, it is likely that the burden of proving that that conduct is not exempt from liability rests on ASCAP. It

is unnecessary to resolve this issue, however, since if Verizon bears the burden of showing that the § 110(4) exemption applies to its customers, it has carried that burden. The law does not impose an insurmountable burden on Verizon to show precisely how each of its customers has actually used her telephone, but only requires it to demonstrate that customers as a group do not exhibit any expectation of profit when they permit the telephones to ring in public. ASCAP having failed to raise a question of fact that Verizon customers do engage in performances that require licenses,[18] Verizon cannot be held secondarily liable for its customers' ringtone "performances."[19]

### b. Direct Liability

 The heart of ASCAP's opposition to this motion for summary judgment rests on its contention that Verizon itself engages in a public performance of copyrighted musical works when ringtones play in public on customers' cellular telephones. ASCAP's theory of direct liability for infringement is that Verizon "controls the entire series of steps that allow and trigger" the cellular telephone to perform the musical work in public. It contends that these actions constitute the performance "publicly" of a musical work under both prongs of § 101's definition of the term "publicly," *i.e.,* that it is both a performance of a musical work "at a place open to the public," *see id.* at (1), and a communication of a performance to the public, *see*

---

**17.** It is therefore unnecessary to discuss whether Verizon meets the criteria for any theory of secondary liability.

**18.** ASCAP has not resorted to Rule 56(f), Fed. R.Civ.P., procedures in order to argue that this issue or any other is not ripe for decision.

**19.** ASCAP and its *amici* Broadcast Music, Inc. and Society of European Stage Authors

& Composers, Inc. argue that Verizon may not stand in the shoes of its customers when determining whether the § 110(4) exception applies to performances of ringtones. Verizon does no such thing. Verizon argues only that its customers' performances are exempt under § 110(4), and Verizon therefore cannot be held secondarily liable for these non-infringing public performances.

*id.* at (2). Insofar as the second prong is concerned, ASCAP admits that Verizon does not "transmit" a musical work when a cellular telephone rings in public,[20] it relies instead on that prong's alternative requirement that the defendant "transmit *or otherwise communicate* a performance ... to the public." *Id.* (emphasis supplied).[21]

ASCAP identifies the following actions by Verizon as constituting the control over the performance process which renders Verizon liable for direct infringement: Verizon supplies the ringtones; it encourages customers to purchase ringtones for public playback; it transmits the ringtones to the subscribers' telephones; it places a code on the ringtones that prevents customers from forwarding them; it provides and supports a cellular telephone network; it "commands, enables and controls" the playing of ringtones "by triggering the tones when calls are received;" and it is able to terminate a customer's cellular telephone service at any time.

ASCAP has failed to identify an issue of fact which prevents entry of judgment in Verizon's favor on ASCAP's theory that Verizon is directly liable for infringement of § 106(4) when ringtones downloaded from Verizon play in public on a Verizon telephone.[22] Verizon does not "recite, render, play, dance, or act [the ringtone] either directly or by means of any device," and thus does not "perform" the music, as that term is defined in the Copyright Act. 17 U.S.C. § 101. Nor does Verizon engage in conduct that can be said to cause a ringtone to be played in public. *See Cartoon Network*, 536 F.3d at 130–31. Verizon's only role in the *playing* of a ringtone is the sending of a signal to alert a customer's telephone to an incoming call. That signal is the same whether the customer has downloaded a ringtone or not, whether she has set her telephone to play a ringtone when she receives a call or not, whether she is in a public setting or not, and whether she has the ringtone volume turned high or low. Once the customer has downloaded the ringtone onto her telephone, she controls the telephone and makes the decisions that determine whether that ringtone will be triggered by an incoming call signal. And, of course, it is someone else entirely—the caller—who has initiated this entire process.

The other components of Verizon's putative "control" over the playing of the ringtone in public are too attenuated from that "performance" to render Verizon liable.[23]

**20.** A transmission requires the delivery of images or sounds "beyond the place from which they are sent." 17 U.S.C. § 101 (definition of "transmit").

**21.** The parties debate whether any activity by Verizon could be said to "otherwise communicate" a public performance of a musical work under the Transmission Clause. 17 U.S.C. § 101 (definition of "publicly"). ASCAP does not identify any principles that would limit the scope of its broad construction of that phrase. In any event, Verizon's sending of a signal to alert a customer's telephone to an incoming call is a signal sent to an individual, not to the public, and could not constitute "otherwise communicat[ing] a performance" to the public. Because ASCAP has failed to raise a question of fact, however, that

Verizon engages in conduct that constitutes a sufficient nexus to the public playing of a ringtone it is unnecessary to grapple further with ASCAP's creative reading of § 101's definition of the term "publicly."

**22.** ASCAP's arguments focus on the playing of ringtones downloaded from Verizon as opposed to those purchased by Verizon cellular telephone subscribers over the internet. The rulings herein would necessarily govern the latter category of ringtones as well.

**23.** This Opinion assumes without deciding that a customer's playing of a ringtone "outside of a normal circle of a family and its social acquaintances" is a performance to the public. 17 U.S.C. § 101.

These include its operation of a cellular telephone network and its ability to disconnect a customer from that service. The marketing of ringtones and the transmission of individual unique copies of ringtones to a customer's cellular telephone certainly implicate rights protected by the Copyright Act, but they are not sufficiently connected to the public performance of the downloaded ringtone to implicate the right protected by § 106(4).[24]

ASCAP relies heavily on the recent decision in *Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124 (S.D.N.Y.2009), for the proposition that a company's provision of a network and its active encouragement of use of the network provides the nexus supporting direct liability. In *Usenet.com*, the defendants ran online bulletin boards on which users posted sound recordings and other messages that could be "read" by others. *Id.* at 130. Users regularly downloaded the sound recordings as music files, a practice that the court found was among "the most popular" of the services provided by the defendants. *Id.* at 148. The court held that the defendants were "actively engaged" in the "exchange of content between users who upload infringing content and users who download such content." *Id.* at 149.

ASCAP's reliance on this case fails. For starters, the defendant's volitional conduct in *Usenet.com* rendered them liable for infringement of the distribution rights protected by § 106(3). Those rights are not at issue here; it is undisputed that Verizon pays mechanical license fees to ASCAP's members. *Usenet.com* simply does not elucidate the degree of volitional conduct that would render a transmitter of

music files liable for a public performance of musical works. While it is undisputed that "Verizon markets ringtones as a way of expressing one's tastes and personality to the outside world," that fact falls far short of showing Verizon's participation in the customer's playing of ringtones in public. To find Verizon directly liable, there must be conduct by Verizon that is "sufficiently close and causal" to its customer's decision to activate the ringtone in a public setting. *See Cartoon Networks*, 536 F.3d at 130 (citation omitted).

ASCAP argues that the fact that Verizon takes no particular step to cause a ringtone to be played in public should not be determinative of its liability since many infringers like Napster, Aimster and Grokster rely on automated systems that require no human intervention by the party enjoying the revenue. This argument skips over the careful analysis of the statutory framework and the individual factual settings in each case that is necessary to determine liability. The three cases on which ASCAP relies all imposed secondary liability on the defendants, not direct liability. *Grokster*, 545 U.S. 913, 929–31, 125 S.Ct. 2764; *In re Aimster Copyright Litig.*, 334 F.3d 643, 645, 651 (7th Cir.2003); *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1011, 1019, 1027 (9th Cir.2001). In addition, despite the accusation that Verizon enjoys revenue from publicly played ringtones, Verizon makes no revenue from the playing of ringtones, in public or elsewhere. It makes revenue from selling ringtones, and it already pays a mechanical licensing fee in connection with those sales. This litigation will resolve whether it must pay as well for the previewing of ringtones. While Verizon may

---

24. To the extent that ASCAP argues that Verizon is directly liable because it is jointly and severally liable along with its customers for any public performance that occurs when a ringtone plays, that argument is rejected.

Joint and several liability is not an independent basis for liability, but a means of allocating responsibility for an award of damages where multiple actors have already been found liable. *See, e.g.*, 17 U.S.C. § 504(c)(1).

theoretically have a duty to pay licensing fees under two separate provisions of § 106 for the same underlying activity, the issue remains whether its conduct creates direct liability for the playing of ringtones in public. In that connection, its use of an automated system to signal the receipt of an incoming call on a customer's cellular telephone remains highly relevant to an evaluation of whether there is a sufficient nexus between Verizon's conduct and the ringing of that telephone in public to require Verizon to pay as well for a § 106(4) license. As already described, there is no sufficient nexus.

Finally, ASCAP argues that Verizon exerts sufficient "control" over the playing of the musical works in public because it has the ability to avoid the infringement by simply not including ASCAP ringtones in its library or paying ASCAP for a performance license. This argument begs the question. ASCAP has not shown any infringement of its members' rights by the playing of ringtones in public from Verizon's customers' telephones. The customers are not liable for copyright infringement, and neither is Verizon.

CONCLUSION

Verizon's May 22, 2009 motion for summary judgment is granted.

SO ORDERED.