Slip Op. 15- 6

UNITED STATES COURT OF INTERNATIONAL TRADE

DIGIDESIGN, INC.,

          Plaintiff,

          v.

UNITED STATES,

          Defendant.

Before: Judith M. Barzilay, Senior Judge

Court No. 08-00331

**OPINION**

[On classification of certain electronic machines summary judgment granted for Defendant; summary judgment denied for Plaintiff.]

Dated:  January 22, 2015

Michael J. Horton, Michael J. Horton Law Office, for the plaintiff.

Joyce R. Branda, Acting Assistant Attorney General; Amy M. Rubin, Assistant Director, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Marcella Powell); and Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection (Paula S. Smith), of counsel, for the defendant.

       BARZILAY, Senior Judge:  This case is before the court on cross-motions for summary judgment.  Plaintiff Digidesign, Inc. ("Digidesign"), challenges the decision of Defendant U.S. Customs and Border Protection ("Customs") denying Digidesign's protest of Customs' classification of its Control 24 and 002 Factory consoles within the Harmonized Tariff Schedule of the United States ("HTSUS").  Customs classified the merchandise as "electrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter;

parts thereof: Other machines and apparatus: Other: Other: Other: Other" under subheading

8543.89.96 (and later under 8543.89.97 and still later under 8543.70.96) of the HTSUS, all of

which carry a 2.6% *ad valorem* duty.[1]  Digidesign contends that the merchandise is properly

classified as units of automatic data processing ("ADP") machines under HTSUS Heading 8471.

Digidesign suggests classification under two alternative subheadings, 8471.60.10 and 8471.80.90

of the HTSUS, both of which carry a 0% *ad valorem* duty.  The court has jurisdiction pursuant to

28 U.S.C. § 1581(a).  For the reasons set forth below, Digidesign's motion for summary

judgment is denied and Customs' motion is granted.

## I. STANDARD OF REVIEW

The court reviews Customs' protest decisions *de novo.* 28 U.S.C. § 2640(a)(1).  USCIT

Rule 56 permits summary judgment when "there is no genuine issue as to any material

fact . . . ." USCIT R. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In considering whether material facts are in dispute, the evidence must be considered in a light

most favorable to the non-moving party, drawing all reasonable inferences in its favor, as well as

all doubts over factual issues. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157

(1970); *Anderson,* 477 U.S. at 253-54.

A classification decision involves two steps.  The first addresses the proper meaning of

the relevant tariff provisions, a question of law.  *See Faus Group, Inc. v. United States,* 581 F.3d

---

[1] Effective April 1, 2006, provisions within heading 8543, HTSUS, were renumbered and subheading 8543.89.96, HTSUS, became 8543.89.97, HTSUS.  There was no material change to the language of the provision.  Effective February 7, 2007, heading 8543, HTSUS, was further modified in that one of the "other" subdivisions was removed.  Again, there was no material change to the language of the provision.

1369, 1371-72 (Fed. Cir. 2009) (citing *Orlando Food Corp. v. United States,* 140 F.3d 1437, 1439 (Fed. Cir. 1998)).  The second step determines the nature of the imported merchandise and is a question of fact. *See id.*  When there is no factual dispute regarding the merchandise, the resolution of the classification issue turns on the first step, determining the proper meaning and scope of the relevant tariff provisions. *See Carl Zeiss, Inc. v. United States,* 195 F.3d 1375, 1378 (Fed. Cir. 1999); *Bausch & Lomb, Inc. v. United States,* 148 F.3d 1363, 1365-66 (Fed. Cir. 1998).

Although the court accords deference to Customs' classification rulings relative to their "power to persuade," *United States v. Mead Corp.,* 533 U.S. 218, 235 (2001) (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)), the court has "an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." *Warner-Lambert Co. v. United States,* 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing *Rocknel Fastener, Inc. v. United States,* 267 F.3d 1354, 1358 (Fed. Cir. 2001)).

## II. UNDISPUTED FACTS

The following facts are not in dispute.  The subject merchandise consists of two types of machines: (1) the Control 24 and (2) the 002 Factory (also known as the 002 Controller).  Digidesign entered the subject merchandise between May 2005 and March 2007.  The Control 24 and 002 Factory are frequently referred to as "control surfaces" because they allow the user to edit, mix, and otherwise manipulate music in digital format on the computer's hard drive with the switches, faders, and knobs located on the consoles.  The Control 24 and 002 Factory are sold through professional audio and musical instrument retailers, and used by professionals in the audio industry for recording and editing music.  Both machines can be connected to a computer

(PC or Mac) by means of (1) an Ethernet cable in the case of the Control 24 and (2) a Fire Wire

cable in the case of the 002 Factory. Presumably, this host computer has been loaded with Pro

Tools®, Digidesign's proprietary digital audio software system.

No digital recording, editing, or mixing occurs on the Control 24 itself; the console

controls those functions on the host computer only. Music and sound are manipulated or

recorded on the host computer through a separate unit (an audio interface unit) that converts the

Control 24's analog signals into digital signals that can be processed by the host computer.[2]

When the user presses a key, uses a fader, or turns a knob on the Control 24, an electrical signal

is sent through the Ethernet cable providing instructions to the Pro Tools® software running on

the host computer. The Control 24, therefore, is able to deliver data in a form (code or signals)

that can be used by an ADP system.

The Control 24 includes 16 premium microphone preamps, a line sub-mixer, and a

control room monitoring section, which are non-data processing functions. These functions can

be used on a stand-alone basis, operating unassisted by the host computer, regardless of whether

the Control 24 is connected to Pro Tools® or routed to destinations other than Pro Tools®. The

Control 24's microphone preamps offer 16 channels of input, which can be routed through the

Control 24 to Pro Tools® for recording. The preamps allow the user to adjust the level of the

analog signal before it is fed into the audio interface unit for conversion into a digital signal for

---

[2] Conversely, the audio interface unit can convert digital signals into analog signals then send those signals to the Control 24, which can then adjust the levels of sound heard on speakers and headphones.

use in Pro Tools®. The Control 24's preamps can also be routed to destinations other than Pro Tools®.

The line sub-mixer of the Control 24 is an independent, eight channel sub-mixer. It takes signals from up to eight sources and mixes them down to two output sources. For instance, the source of the signals could be instruments or synthesizers that are on separate channels. Those channels are fed into the Control 24, the volume adjusted and the channels mixed. The line sub-mixer outputs can then be integrated into Pro Tools® or other external destinations through discrete connections to audio interface units, or used only as monitoring sources within the Control 24.

The control room monitoring section of the Control 24 routes input from Pro Tools® and other sources to multiple sets and configurations of speakers and headphones. In particular, this monitoring section of the Control 24 permits the user to hear the digital signals that have been manipulated in Pro Tools®. The Control 24 provides visual feedback from Pro Tools® by means of light emitting diodes (LED). For instance, levels of sound in Pro Tools® are fed back to the Control 24 and displayed on the console by means of a meter bridge, which is a row of lights. The Control 24's control room monitoring section is also used to communicate between the control room and other rooms or booths, a function referred to as Talkback and Listenback.

Unlike the Control 24, the 002 Factory can perform analog signal to digital signal conversion. Consequently, the 002 Factory can record music and sound directly on the user's computer for manipulation in the Pro Tools® software, which can all be accomplished without an audio interface unit. When the user presses a key, uses a fader, or turns a knob on the 002 Factory, an electrical signal is sent through the Fire Wire cable, sending instruction to the Pro

Tools® software running on the host computer. The 002 Factory, therefore, is also able to deliver data in a form (code or signals) that can be used by an ADP system.

The 002 Factory includes two analog audio features, which are non-data processing functions. Specifically, the machine has four microphone preamps and a control room monitoring section. The 002 Factory's preamps function similarly to the Control 24's preamps. Also, as with the Control 24, the 002 Factory's control room monitoring section provides several options for routing outputs and monitoring alternate input sources. However, the 002 Factory can also operate as a separate, stand-alone 8x4x2 digital mixer. As a stand-alone 8x4x2 digital mixer, the 002 Factory allows the user to mix eight channels of music and sound using the faders and then send the resulting signals out to speakers or headphones. Using the 002 Factory as a stand-alone digital mixer does not involve the user's computer or Pro Tools®. Internal controls within the 002 Factory automatically disconnect from the computer and communication with Pro Tools® is suspended when the machine is used as such. Separate cables not imported with the 002 Factory must be purchased to use the machine as a stand-alone digital mixer.

## III. DISCUSSION

### A. Subject-Matter Jurisdiction Over The "002 (RACK) Controller FAC"

Customs challenges the court's subject-matter jurisdiction over the articles in Entry No. 607-1466937-5 listed as "002 (RACK) Controller FAC" on the corresponding commercial invoices. Def. Br. 8 n.11. Customs argues that the term "RACK" refers to a product not at issue in this case, the 002 Rack also known as the Digi 002R. *See* Def. Reply Br. 13. According to Customs, the court lacks jurisdiction over these articles in Entry No. 607-1466937-5 since Digidesign's complaint does not include any claims relating to the Digi 002R. Def. Br. 8 n.11.

Digidesign, however, argues that the description "002 (RACK) Controller FAC" on the commercial invoices related to Entry No. 607-1466937-5 refers to the 002 Factory. Pl. Reply Br. 10. Digidesign argues that the court maintains jurisdiction over the articles in Entry No. 607-1466937-5 that bear this description on the related invoices. *Id.* Digidesign advances several arguments in support of its position. Digidesign argues that this description contains the misprint, "RACK", which the relevant bill of lading corrects. *Id.* at 7-9. Moreover, Digidesign contends that the Digi 002R and 002 Factory are distinguishable by their claimed values. *Id.* at 9. According to Digidesign, the 002 Factory is "significantly more expensive" than the Digi 002R. *Id.* As such, Digidesign argues, the $588.00 unit cost of the articles described as "002 (RACK) Controller FAC" on the commercial invoices, when compared to the $399.00 unit cost of the Digi 002R, makes clear that the "002 (RACK) Controller FAC" is in actuality the 002 Factory. *Id.* Additionally, Digidesign argues that Customs' decision regarding Digidesign's protest further supports this conclusion. *Id.* at 9-10. In particular, Digidesign points to Customs' reliance on the protest worksheet prepared by Digidesign, which states that "002 (RACK) Controller FAC" on the commercial invoices refers to the 002 Factory. *Id.*

Pursuant to 28 U.S.C. § 1581(a), the court "has exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930." Protests "may challenge the classification of a single entry of merchandise, or encompass a number of entries . . . ." *DaimlerChrysler Corp. v. U.S.*, 442 F.3d 1313, 1314 (Fed. Cir. 2006). Therefore, the identification of specific entries in a plaintiff's complaint in part defines the boundaries of the court's subject-matter jurisdiction in a given action. Moreover, it is

the commercial invoice that sets forth a "detailed description of the merchandise" within each entry, further defining the bounds of the court's jurisdiction. 19 C.F.R. § 141.86(a)(3).

Here, Digidesign identified Entry No. 607-1466937-5 in its complaint. Compl. Schedule A at 3. Furthermore, four types of merchandise are described on the relevant commercial invoices for Entry No. 607-1466937-5: the MboxII FAC, 002 (RACK) Controller FAC, 002 (RACK) Controller and Control 24. Pl. Reply Br. Ex. D. Yet, despite Digidesign's arguments to the contrary, Digidesign's designated agent testified that the term "RACK" signifies the Digi 002R, which is a product not referenced in any claim raised by Digidesign. Def. Reply Br. Ex. B at 151-52 (Plaintiff's Deposition Transcript (Cont.)); *see generally* Compl. Therefore, as Digidesign included in its complaint claims referencing only the Control 24 and 002 Factory, the court lacks subject-matter jurisdiction over the articles in Entry No. 607-1466937-5 described as "MboxII FAC", "002 (RACK) Controller FAC" and "002 (RACK) Controller" on the related commercial invoices.[3]

## B. Classification Of The Control 24 And 002 Factory

The court now turns to the classification of the subject merchandise. The "General Rules of Interpretation ("GRIs") govern classification of merchandise under the HTSUS, and are applied in numerical order." *Honda of America Mfg. v. United States*, 607 F.3d 771, 773 (Fed. Cir. 2010) (internal quotations and citations omitted). "What is clear from the legislative history of the World Customs Organization ("WCO") and case law is that GRI 1 is paramount." *Telebrands Corp. v. United States*, 36 CIT __, __, 865 F. Supp. 2d 1277, 1280 (2012). When

---

[3] It is undisputed that the MboxII FAC is not at issue in this case. *See* Pl. Reply Br. 10; Def. Br. 3 n.5.

determining the correct classification for merchandise, a court first construes the language of the headings in question, in light of any related section or chapter notes. *See* GRI 1; *Faus Grp., Inc. v. United States*, 581 F.3d 1369, 1372 (Fed. Cir. 2009) (citing *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998)).[4] The "terms of the HTSUS are construed according to their common commercial meanings." *Millenium Lumber Distrib. Ltd. v. United States*, 558 F.3d 1326, 1329 (Fed. Cir. 2009). To ascertain the common commercial meaning of a tariff term, the court "may rely on its own understanding of the term as well as lexicographic and scientific authorities." *Len-Ron Mfg. Co. v. United States,* 334 F.3d 1304, 1309 (Fed. Cir. 2003). The court may also refer to the Harmonized Description and Coding System's Explanatory Notes ("Explanatory Notes") "accompanying a tariff subheading, which - although not controlling - provide interpretive guidance." *E.T. Horn Co. v. United States,* 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citing *Len-Ron,* 334 F.3d at 1309).

This case involves the proper classification of Digidesign's consoles as either units of automatic data processing machines or electrical machines having specific non-data processing functions not covered under any HTSUS provision. The competing tariff provisions are HTSUS Heading 8471 and HTSUS Heading 8543. HTSUS Heading 8471 provides in relevant part:

> Automatic data processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data, not elsewhere specified or included:
> . . .

---

[4] This case also involves the interpretation of the HTSUS subheadings, which requires application of GRI 6, which prescribes the same methodology set forth in GRI 1 and provides that classification "shall be determined according to the terms of those subheadings and any related subheading notes," including "the relative section, chapter and subchapter notes." GRI 6.

8471.60 Input or output units, whether or not containing storage units in the same housing:

8471.60.10 Combined input/output units. . . . . . . . . . . . . . 0%

. . .

8471.80 Other units of automatic data processing machines:

8471.80.90 Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0%

HTSUS Heading 8471. Therefore, HTSUS Heading 8471 covers machines that are automatic data processing machines and units thereof.

Alternatively, HTSUS Heading 8543 provides in relevant part:

Electrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter; parts thereof:
. . .

8543.70 Other machines and apparatus:

8543.70.96 Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2.6%

HTSUS Heading 8543. HTSUS Heading 8543 is a residual heading that covers machines whose specific functions are not covered by any other heading of the HTSUS. Therefore, HTSUS Heading 8471 and HTSUS Heading 8543 are mutually exclusive. If merchandise is classified under HTSUS Heading 8471, then it cannot be classified under HTSUS Heading 8543.

The Chapter Notes to HTSUS Heading 8471 define the term "automatic data processing machines." Chapter 84, Note 5(B) provides:

Automatic data processing machines may be in the form of systems consisting of a variable number of separate units. Subject to paragraph (E) below, a unit is to be regarded as being a part of a complete system if it meets all of the following conditions:

(a) It is a kind solely or principally used in an automatic data processing system;

(b)  It is connectable to the central processing unit either directly or through one or more other units; and
(c)  It is able to accept or deliver data in a form (codes or signals) which can be used by the system.

HTSUS Chapter 84, Note 5(B).  Chapter 84, Note 5(B) references Chapter 84, Note 5(E), which

states:

> Machines performing a specific function other than data processing and incorporating or *working in conjunction* with an automatic data processing machine are to be classified in the headings appropriate to their respective functions or, failing that, in residual headings.

HTSUS Chapter 84, Note 5(E) (emphasis added).

Customs maintains that the subject merchandise cannot be classified as units of ADP

machines, but must instead be classified under the residual heading based upon their non-data

processing functions. Def. Br. 9.  More specifically, Customs argues that Chapter 84, Note 5(E)

precludes classification of the subject merchandise under HTSUS Heading 8471. *Id.*

First, Customs identifies the subject merchandise's non-data processing functions. *See id.*

at 14, 16.  The Control 24's non-data processing functions include preamps, line sub-mixing, and

control room monitoring. *Id.* at 14.  The 002 Factory's non-data processing functions include

preamps and control room monitoring. *Id.* at 16.  Next, Customs contends that "working in

conjunction" with an ADP machine "refers to a machine that performs or operates [non-data

processing functions] while conjoined (joined together, connected) with an ADP machine." *Id.* at

15.  According to Customs, the "Control 24 is capable of and is in fact expressly designed for

remaining connected to an ADP machine while simultaneously performing both data processing

functions and other specific, non-data processing/analog functions." *Id.*  Moreover, according to

Customs, "specific non-data processing functions may be performed while [the] 002 Factory is

connected to an ADP machine (computer) and while the user is running Pro Tools to digitally edit and mix music." *Id.* at 16.

Digidesign takes the position that Chapter 84, Note 5(E) does not apply to the subject merchandise. Pl. Reply Br. 2.  More specifically, Digidesign argues that "working in conjunction" should be interpreted as requiring the ADP machine (host computer) to be "running, assisting, or somehow interacting with the machine to help the machine perform the non-data function." Pl. Br. 32-33.  According to Digidesign, no such interaction exists between the host computer and either the Control 24 or the 002 Factory. *Id.* at 35-37.  Digidesign further argues that the subject merchandise meets all the requirements of Chapter 84, Note 5(B), and, therefore, qualifies to be classified as units of ADP machines under HTSUS Heading 8471 by virtue of GRI 1. Pl. Br. 7.

The parties acknowledge that this case may ultimately turn on whether Chapter 84, Note 5(E) precludes classification of the subject merchandise under HTSUS Heading 8471. Pl. Reply Br. 2; Def. Br. 9.  The court, therefore, will determine whether the Chapter Note does indeed resolve this case.

### C.  The Meaning And Scope Of Chapter 84, Note 5(E)

To effect preclusion, Chapter 84, Note 5(E) first requires that a machine perform "a specific function other than data processing."  This requirement is satisfied.  The Control 24 performs three non-data processing functions.  The machine functions as a microphone preamp, a line sub-mixer, and a control room monitor.  The 002 Factory performs two non-data processing functions.  The machine functions as a microphone preamp and a control room monitor.

Next, Chapter 84, Note 5(E) requires that the machine either incorporate an ADP machine or work in conjunction with an ADP machine. Neither the Control 24 nor the 002 Factory incorporate an ADP machine. Rather, this portion of the dispute turns on the meaning and application of the phrase "working in conjunction."

The HTSUS does not specifically define the phrase "working in conjunction." Digidesign, however, contends that the Federal Circuit "established certain important precedent[]" in *BenQ America Corp. v. United States*, 646 F.3d 1371 (Fed. Cir. 2011). Pl. Br. 15.

*BenQ* concerned the classification of LCD monitors equipped with connectors for receiving data from a personal computer, digital camera, VCR, DVD player and other devices. 646 F.3d at 1373. Before concluding that the Court of International Trade erred in not conducting a principal use analysis with respect to the LCD monitors, the Federal Circuit noted that application of Chapter 84, Note 5(E) "is limited to '[m]achines performing a specific function other than data processing and incorporating or working in conjunction with an automatic data processing machine.'" *Id.* at 1373, 1379. Moreover, according to the Federal Circuit, "when 'performing a specific function other than data processing,' such as when the monitors are serving as video monitors for other devices such as DVD players and VCRs, the monitors are 'working in conjunction' with those other devices, not with an automatic data processing machine.'" *Id.* at 1379 (footnote omitted). Digidesign reads into this observation a pronouncement regarding the meaning of "working in conjunction." The court does not agree. The Federal Circuit did not define, much less elaborate on, the phrase. No analysis was given. *BenQ*, therefore, provides no aid to the court's understanding of the phrase "working in conjunction." *See, e.g.*, *Thacker v. FCC (In re Magnacom Wireless, LLC)*, 503 F.3d 984, 993-94

(9th Cir. 2007) ("[S]tatements made in passing, without analysis, are not binding precedent.") (citation omitted); *NFL v. Primetime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000) ("We accord the decision little weight largely because it contains no analysis of the Copyright Act.").

Consequently, the court now turns to lexicographic sources to interpret the phrase "working in conjunction." "Working" is derived from the verb "work." Oxford English Dictionary (2014), *available at* http://www.oed.com/view/Entry/230236?rskey=FfEiZa&result=1#eid (last visited Dec. 2, 2014). "Work" means "to act, do, function, operate," or, with respect to a machine "to function, run, operate, especially properly or effectively, or in a specified manner." Oxford English Dictionary (2014), *available at* http://www.oed.com/view/Entry/230217?rskey=zkFsI6&result=2#eid (last visited Dec. 3, 2014). "Conjunction" is defined as "the action of conjoining; the fact or condition of being conjoined; union, connection, combination." Oxford English Dictionary (2014), *available at* http://www.oed.com/view/Entry/39279?redirectedFrom=conjunction#eid (last visited Dec. 3, 2014). "Conjoin" means "to join together; to connect, unite." Oxford English Dictionary (2014), *available at* http://www.oed.com/view/Entry/39248?rskey=Lc9eNK&result=2&isAdvanced=false#eid (last visited Dec. 3, 2014). "Conjoin" also means "to join together for a common purpose." Merriam-Webster Online Dictionary (2014), *available at* http://www.merriam-webster.com/dictionary/conjoin (last visited Dec. 3, 2014).

Therefore, "working in conjunction" can be defined under the HTSUS as functioning or operating in a specified manner while joined together for a common purpose. From this definition the court determines that the Control 24 and the 002 Factory are machines that are

precluded from classification under HTSUS Heading 8471 by operation of Chapter 84, Note 5(E). More specifically, the Control 24 and the 002 Factory not only perform a specific function other than data processing, but the machines do so while working in conjunction with ADP machines (host computers).

As marketed, the Control 24 provides preamp, line sub-mixing, and control room monitoring non-data processing functions while connected to a host computer loaded with Pro Tools® to digitally edit and mix music. Def. Facts Ex. N at 3 ("*Control 24 User Guide*").  In particular, the Control 24's preamp function adjusts the signals coming into the Control 24 from microphones or other sources to appropriate levels before they are fed through the audio interface unit and into the host computer running Pro Tools®. Def. Br. Ex. B at 62 ("*Plaintiff's Deposition Transcript Part 1*").  The Control 24's line sub-mixer function blends channels of signals for eventual input into the host computer running Pro Tools®. *Control 24 User Guide* at 13, 20.  Finally, digital signals from the host computer running Pro Tools® are converted to analog signals by the audio interface unit and are sent "back into the monitoring section of the Control 24 . . . where you then adjust the volume for your studio speakers . . . ." *Plaintiff's Deposition Transcript Part 1* at 71.

The 002 Factory, although less sophisticated in its circuitry and hardware control features, "operates much like the Control 24 in terms of mixing and editing of music" while the machine is connected to a host computer running Pro Tools®. Pl. Br. 10.  More specifically, no difference exists between the functionality of the preamps of the Control 24 and the 002 Factory. Def. Facts ¶ 29; Pl. Resp. Facts ¶ 29.  Furthermore, the 002 Factory's control room monitoring function also receives signals from the host computer running Pro Tools® and allows the user to

adjust the volume for their studio speakers. *See* Def. Reply. Br. Ex. J (Digi 002 & Digi 002 Rack Getting Started Guide); *Control 24 User Guide* at 53.

The Control 24 and 002 Factory therefore "work in conjunction" with an ADP machine because the consoles perform the abovementioned functions while connected to a host computer loaded with Pro Tools® to achieve the common purpose of digitally editing and mixing music. As the two requirements of Chapter 84, Note 5(E) are satisfied, the Control 24 and 002 Factory must be classified "in the headings appropriate to their respective functions or, failing that, in residual headings."

No other HTSUS heading describes the specific non-data processing functions provided by either the Control 24 or 002 Factory. More specifically, the consoles' preamp, line sub-mixer and control room monitoring functions are not described by any other HTSUS heading. The consoles, therefore, are classifiable in the residual provision, HTSUS Heading 8543. *See* HTSUS Chapter 84, Note 5(E); HTSUS Heading 8543. In particular, both machines are properly classified as "electrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter; parts thereof: Other machines and apparatus: Other" under subheading 8543.70.96 of the HTSUS (and 8543.89.96 and 8543.89.97 of the HTSUS depending on the year of importation). *See* GRI 6.

### IV. CONCLUSION

For the foregoing reasons, summary judgment is granted in favor of Defendant. Judgment will be entered accordingly.

Dated:   January 22, 2015                                    /s/ Judith M. Barzilay
         New York, NY                                        Judith M. Barzilay, Senior Judge